SIXTH DIVISION
August 29, 2008

No. 1-05-3645

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 00 CR 27032 |
| v. | ) | |
| | ) | |
| CASEY NOWICKI, | ) | Honorable |
| | ) | Rickey Jones, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

In December 2000, defendant, Casey Nowicki, was charged in a seven count indictment for the 1984 murder of the victim, Marcy Andrews, whose body was never found. Following a jury trial in the circuit court of Cook County, defendant was found guilty of first degree murder and sentenced to natural life in prison. Defendant contemporaneously filed a post-trial motion seeking a new trial, and a section 2-1401 petition for relief from judgment seeking to vacate his conviction. The circuit court denied defendant's post-trial motion for a new trial and dismissed his section 2-1401 petition, and defendant now appeals from both. Defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) he received ineffective assistance of counsel where in opening argument counsel promised to advance various theories of the case but then failed to do so, and where counsel failed to challenge the competency of the

1

No. 1-05-3645

State's key witness despite the witness's inability to recollect the events; (3) he was denied due process when the trial court permitted the State to present and rely on the perjured testimony of its key witness at trial; and (4) he was denied a fair trial when the prosecution improperly shifted the burden of proof to defendant. For the reasons that follow we affirm.

I.  BACKGROUND

In 2000, nearly 16 years after the crime had been committed, defendant was charged in a seven-count indictment with the first degree murder of Marcy Andrews. That indictment included: (1) one charge of intentional first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/9-1(a)(1) (West 2000)), in that defendant unlawfully, intentionally or knowingly killed Marcy Andrews by drugging and strangling her; (2) one charge of first degree murder in violation of section 9-1(a)(2) of the Criminal Code (720 ILCS 5/9-1(a)(2) (West 2000)), in that defendant knew that the drugging and strangling of Marcy Andrews created a strong probability of death or great bodily harm to her; and (3) five charges of felony murder in violation of section 9-1(a)(3) of the Criminal Code (720 ILCS 5/9-1(a)(3) (West 2000)), in that Marcy Andrews was killed while defendant was committing the forcible felonies of rape, aggravated kidnaping, aggravated battery, unlawful restraint, and/or deviate sexual assault.

Defendant was tried before a jury in July 2005. The evidence adduced at trial established the following pertinent facts. In 1984, Sara Andrews lived on the north side of Chicago with her husband Robert and two minor children. Sara also had an adult daughter, the victim, 24-year-old Marcy Andrews. At that time, Marcy was 5 feet 2 inches tall and weighed about 120 pounds.

2

Sara testified at trial that Marcy was not Robert's daughter but rather the daughter of James Prather, who was no longer alive at the time of the trial. Sara explained that she married Robert when Marcy was 11 years old and that she then changed Marcy's last name to Andrews. According to Sara, Marcy lived in an apartment in her step-grandmother's house on the northwest side of Chicago.

According to Sara, sometime in 1982, Marcy approached her and told her that she had a drinking problem and that she wanted to go to a treatment center. Sara stated that soon thereafter Marcy entered herself in a program called Crossroads at St. Xavier University, where she stayed for about nine months. While at Crossroads, Marcy attended Daley Junior Community College. According to Sara, Marcy wanted to make sure her treatment was complete and she also wanted to counsel other people who came to the center.

After leaving Crossroads, Marcy moved into an apartment in her step-grandmother's house and enrolled in nearby Northeastern Illinois University. In February 1984, Marcy worked at Periodical Publishers on West Lawrence Avenue in Chicago. At that time, she had stopped attending Northeastern University because she had made plans to move to Paducah, Kentucky, where Sara's sister lived. According to Sara, Marcy had already traveled to Paducah to apply for a job in Wal-Mart, find an apartment, and obtain the necessary application forms for Paducah Community College. Marcy intended to leave Chicago in mid-March in order to start the summer semester at Paducah Community College on June 1.

Sara testified that at approximately 5 p.m. to 6 p.m., on February 13, 1984, she arrived home from work, where Marcy had been babysitting her step-sister Jessica. According to Sara,

Marcy had just taken a shower and was blow-drying her hair. Marcy needed a ride back to her apartment, and her stepfather gave her a ride home. Sara testified that this was the last time she saw Marcy.

Sara averred that two days later, on February 15, 1984, she called Marcy in order to ask if they could get together so that she could give Marcy a box of Valentine's Day chocolates that she had bought for her. Sara stated that she was unable to reach Marcy and instead spoke to her mother-in-law, who shared a telephone with Marcy. Sara testified that she learned that Marcy had not called her step-grandmother the night before to tell her that she would not be home. Sara stated that she became concerned when she heard this. She explained that it was unusual for Marcy not to call her step-grandmother because it was common for Marcy's step-grandmother to wait up for Marcy with a sandwich and something to drink so that they could talk before going to bed. According to Sara, Marcy had always been very attentive and respectful toward her step-grandmother.

Sara averred that she then learned that Marcy had been with a friend named Dori Pernell,[1] but that she did not know Dori's address or telephone number. Sara attempted to find Dori's telephone number but discovered that it was unlisted. She then asked her mother-in-law to make a note of everyone who called for Marcy and get their contact information. According to Sara, her mother-in-law did just that and every time someone called, she would report to Sara, who would call the person and ask them to tell her the last time they had seen or heard from Marcy. For a week, Sara could not find anyone who had seen or heard from Marcy. On the weekend,

---

[1]Dori Pernell is also known was Dori Garrity.

4

Sara drove to the family's second home in Michigan to check if Marcy had gone there and collect some of her old address books, where she hoped she could find Dori's telephone number. To Sara's dismay, however, there were no signs that Marcy had been inside the Michigan home.

While Sara was in Michigan, she received a telephone call from her mother-in-law saying that Dori had called and left a telephone number. Sara called Dori from Michigan, and after speaking with her, Sara decided to immediately call the police. Upon her return to Chicago, Sara also filed a missing person's report with the Chicago police department, providing the police with descriptions and photographs of Marcy and any other relevant information.

Sara testified that she did not hear from the police in the next few days, but that she continued "to call anybody she could," including her sister in Paducah, her parents, and other relatives, asking if they had heard from or seen Marcy. Sara also called Marcy's employer, who told her that Marcy had not shown up for work. Sara telephoned Crossroads and spoke to a few counselors there, who told her that Marcy was supposed to have lunch with one of them, but that she failed to show up. The counselors were "quite concerned" when they had not heard from Marcy.

Sara averred that she also went into Marcy's apartment. According to Sara, the apartment was very neat, Marcy's bed was made, a paperback book was open and overturned on the night stand and Marcy's reading glasses were on top of the paperback. It appeared to Sara that Marcy had started separating her clothes for the move to Paducah, because there was "a pile of discards, she had a pile of washing, and a pile of ironing," and the ironing board was set up. On the desk Sara found a few bills in envelopes, with dates written on them indicating on which date they

were supposed to be mailed. On the desk, Sara also found some gold chains and jewelry. Sara also observed a request for transcripts to be sent to Kentucky and a savings passbook for Irving Federal Savings. Sara testified that from what she observed in the apartment she could not determine if anything was missing or if it appeared that Marcy was going to come back. Sara averred that she could not find Marcy's purse, but that she took the contents of the wastebasket, Marcy's old telephone books and letters, Christmas cards, and "anything that was there that had anything written on it."

In the following days, Sara spoke to Marcy's friends, Dori and Gay Dell, and then to David Harold. Sara searched area hospitals for Marcy but there were no record of Marcy there. Sara also made flyers with Marcy's photo and together with relatives distributed them continuously throughout the area.

Sara also contacted Marcy's birth father and asked him if Marcy had talked about anything out of the ordinary recently. Marcy's father was very concerned and told Sara that the last time he spoke to Marcy she seemed normal. According to Sara, Marcy's father called back with a list of all the calls Marcy had made from Boston at the time she was visiting him. Sara contacted all the people from that list but learned nothing about Marcy's whereabouts.

Sara next sent a mass-mailing explaining the circumstances of Marcy's disappearance to all the coroners in every county in Illinois, Wisconsin, Indiana and Michigan. Coroners began contacting her and asking for medical records.

According to Sara, Marcy had a gynecologist, a foot doctor, and a dentist. She obtained medical records and X-rays from the foot doctor and dentist and gave them to the police. She

also contacted Marcy's gynecologist and was told that the last time Marcy had been there was in December 1983.

Sara testified that she then called the National Center for Missing and Exploited Children, where she was told that the agency dealt only with the disappearance of minors under the age of 14, and was referred to an agency called Search Registry. Sara sent Marcy's picture and information to Search Registry, which distributed it to places like the Salvation Army and halfway houses throughout the United States. This search produced no results.

Sara averred that in her efforts to find Marcy she also went to Marcy's bank, the Irving Federal Saving and Loan, in Chicago, where she spoke to a teller. According to Sara, the last entry made in Marcy's passbook was in December 1983. The teller put a red flag on Marcy's account to notify Sara of any future activity on the account. According to Sara, seven years later, in 1991 she received a notification indicating that Marcy's account was "unclaimed property." Sara went to the bank and collected the money which totaled $91.

Sara was next questioned about Marcy's habits and routines. Sara testified that Marcy was a girl who always stayed in touch with friends and relatives. Sara stated that Marcy regularly visited her house, especially on holidays, and spent time with Sara's younger children. According to Sara, Marcy was "always wanting to take them to the zoo, or do something fun with them." Sara also stated that she was very close to Marcy because for the first 11 years of Marcy's life the two of them were together. Also, Sara went to college while she was raising Marcy, and the two of them were very open with each other. Sara testified that she believed Marcy would come to her if she had a problem or needed to talk about something.

Sara testified that Marcy was also very conscientious about her work and always wanted to maker her quotas as a verifier in the publishing company where she worked when she disappeared in February 1984. Sara stated that after February 14, 1984, Marcy never showed up to work, and even left a paycheck there.

Sara finally testified that she "did everything that she possibly could" to find Marcy, but that to her knowledge no one has ever heard or seen Marcy since her disappearance on February 14, 1984.

On cross-examination, Sara acknowledged that Marcy was born on January 1, 1960, and that her birth certificate reads Marcy Jo Prather. Sara explained that she and Marcy's biological father, James Prather, were never legally married but that Sara had put the name Prather on Marcy's birth certificate because Sara and Prather had "been living [together] common law for several months."

Sara testified that she lived with Marcy in Vermillion County, Illinois, until 1964 when she moved to Chicago, where she met Robert Andrews. Sara acknowledged that in 1971 when Marcy was 11 years old she married Robert Andrews and changed Marcy's name to Andrews.

On cross-examination, Sara acknowledged that Marcy and her biological father, James Prather, never spent time together when Marcy was a little girl. Sara testified, however, that while Marcy was at Crossroads in 1983 she contacted her birth father and went to visit him in Boston. According to Sara, Marcy was disappointed in James Prather because the first thing he did when he met her at the airport, although he knew she was coming from a rehabilitation center, was to invite her to go to a bar, telling her "You are here with me, you can do anything

8

you want." Sara testified that they were unaware at that time that Prather was an alcoholic. According to Sara, Marcy had told her that James Prather "does not know how to be a father." Sara stated that despite this disappointment, soon after meeting James Prather, Marcy went on a cruise with him and his new girlfriend.

On-cross examination, Sara also acknowledged that Dori had been Marcy's roommate before she entered Crossroads. She also testified that she later became aware that Dori and Marcy did drugs together and that she was concerned that Marcy continued to be friends with Dori after she came out of the intervention program. Sara acknowledge, however, that she did nothing to prevent Marcy from spending time with Dori.

Sara admitted that Marcy dropped out of Lane Tech high school to waitress in a cocktail lounge but indicated that Marcy always had a job since age 16, first at Treasure Island, then at Marina City and then in the coat check of the East Bank Club.

On cross-examination, Sara admitted that after dropping out of high school, Marcy, together with Dori, went by bus to Sara's sister's house in Texas. Sara stated that although at that time she was unaware that Dori and Marcy were doing drugs on that trip, she now knows that they were.

On cross-examination, Sara also testified that at the time she was working in the East Bank Club, Marcy told her that she was in a car accident where she blacked out. According to Sara, Marcy was with a basketball coach and they had borrowed somebody else's car, when they got into the accident. Marcy told Sara that she "did not know why she suddenly decided to move the car because it was double-parked," but that this was when they got into the accident. Marcy

also told Sara that she was concerned that the girl whose car she had borrowed and wrecked would do something to her and that she therefore needed to leave town for a while.

Sara also acknowledged that after that car incident, Marcy went on about a month-long "cross-country jaunt with a Mayflower truck driver." Sara explained, however, that during the trip Marcy called her and told her the name, dispatch number, and log number of the truck driver. She also testified that Marcy called her every few days and that she sent post cards to her step-siblings. Sara stated that it appeared that Marcy liked traveling around the country and helping the truck driver with his inventory.

Michael John Panisi next testified that he was born Michael John Panisiak but that the military changed his name to Panisi. Panisi testified that he grew up in Chicago near Chicago Avenue and Western Avenue, and that he dropped out of school after the eight grade. Panisi stated that at age 17 he joined the military and that he was in the special forces, "a beret." Panisi stated that he served three tours in Vietnam and that he was 21 years old when he left the military. Panisi testified that as a result of the drugs he took in Vietnam and the flashbacks that he experienced from the war, he was "messed up" after he left the military. He testified that "tic sticks, cocaine, marijuana, and heroine" were available to him in Vietnam and that this was a problem for a lot of soldiers there, who died as a result of these drugs.

Panisi averred that after he left the military, he had many odd jobs, including working as a cook, a truck driver, a taxi cab driver, and a construction worker. He described himself as a "jack of all trades, master of none."

Panisi was next asked by the prosecutor whether he knew defendant. Panisi indicated

that he did. At this point, the prosecutor asked Panisi if he could see defendant in the courtroom, and Panisi indicated that he could not. After standing up and looking around the courtroom, Panisi could still not identify defendant. He, however, explained that it has been a long time, about 20 years, since he last saw defendant.

Panisi next testified that in February 1984, he had known defendant for about a couple of months. He stated that he had been to defendant's apartment on Rockwell and Iowa, directly across the street from Archie's bar. According to Panisi, defendant's apartment was on the second floor of the building, which was owned by defendant's mother. Panisi testified that around Valentine's Day in February of 1984 he went to defendant's apartment to buy drugs. While there he saw a naked girl handcuffed to radiator who was "all scr---ed up on the drugs that [defendant] was selling." Panisi stated that you could not see the girl from the front door, but that you had to enter the kitchen, where the girl was handcuffed to a cast iron, "old time" radiator. According to Panisi the girl was sitting on the kitchen floor with one hand handcuffed to the radiator. When Panisi saw the girl he asked defendant "Man, what is this? Man what are you doing with this girl?" Defendant replied "She's too screwed up to be walking around the apartment." Defendant told Panisi that he had given the girl some THC, which she took of her own free will. Defendant also told Panisi, "I can't have her running all around while I'm trying to do my business, and she's falling all around, and I don't want her to start busting up shit and hurt herself." Panisi explained that defendant sold drugs, specifically THC, which is an animal tranquilizer also known as PCP, "angel dust" or "tic."

Panisi testified that after observing this, he removed the girl's handcuffs and walked her

11

to the kitchen table to give her some peanut butter, milk and orange juice. Panisi intended to make the girl vomit to get the drugs out of her system, but after he gave her the orange juice and milk she only started spitting the food and vomiting a little, "but not enough." Panisi told defendant to "get [the girl] some clothes," and the two of them dressed her in pants and a blouse, but with difficulty because she was "flopping all over the place, and "was too zoned to help." After that, Panisi bought drugs off defendant and told him he had to go. Defendant responded, "[w]ell I'm going to just cuff her back up." Panisi took his "two grams" of "tic" and left.

Panisi averred that he went to defendant's apartment again the next day and observed the girl on the couch next to defendant. The girl was not handcuffed at this time. According to Panisi, a customer came by to buy drugs from defendant, and defendant told him "[h]ere man, take care of this girl." The customer then forced the girl to have oral sex with him. Panisi testified that the girl again seemed to be "out of it," and that she did not appear to know what was going on around her. Panisi then explained that defendant told him that the girl had snorted one whole gram of THC, which, according to Panisi was "a lot." Panisi himself would take only a fourth of a gram. Panisi further stated that defendant's drugs were so potent that "[s]ome people don't come back from it. That's how strong his stuff was."

After refreshing his memory from the transcript of his grand jury testimony, Panisi acknowledged that when he asked defendant how the girl ended up in this condition, defendant told him that they were snorting drugs together and that he had told her that she was snorting cocaine when in fact she was snorting the more powerful THC. Defendant said that he tricked the girl in this way because "she screwed up his mama's car." According to defendant, the girl

12

had grabbed his steering wheel and made him crash the car. Panisi stated that defendant then showed him the car, which was white and had right front damage, and asked Panisi to help him fix it. Panisi refused, indicating that he did not know anything about cars.

Panisi also averred that he initially called the girl Stacy but that after he looked into her wallet, which was on the couch, he saw her driver's license and discovered that her name was Marcy. Panisi stated that he then told the girl, "Marcy, you got to straighten up," but it was like talking to a "vegetable." Panisi testified that throughout the two days the girl's condition did not change much, because of how much THC she had initially taken.

Panisi testified that he went to the apartment to buy drugs on the third day. This time the girl was in a blanket or rug on the floor. When Panisi asked defendant what had happened, defendant responded "she's died on me, man." Panisi told defendant to call the police, but defendant said, "no, help me get her out of here." Panisi refused and started walking down the steps. Defendant told Panisi not to come to the apartment again, put the body over his shoulder and took it down the stairs himself. Panisi then observed defendant put the girl's body in the trunk of his mother's car and drive off swearing at Panisi. Panisi averred that defendant put the body in a green car, and he explained that he knew that the car belonged to defendant's mother, because he had previously met defendant's mother, who lived on the first floor of the building, and had observed her driving that same green car.

Panisi finally testified that he suffers from bipolar disorder for which he takes lithium and Halidol. Panisi also indicated that he receives $720 a month from Social Security because of his bipolar disorder and that he has been receiving these payments for about 15 years. Panisi

13

acknowledged that before trial he was in the Las Vegas city jail where he was to remain until October 2005, but that investigators from the State's Attorney's office flew to Las Vegas to bring him to Chicago in July 2005, to testify at defendant's trial. Panisi explained that he then received "time considered served for the Las Vegas case." Panisi finally stated that after his testimony he would be taken to a Greyhound station with the State's Attorney's office paying for his trip and giving him some money for food.

On cross-examination, Panisi acknowledged that when he was younger he was called "Gymshoe" because when he got into fights he would take off his shoe and beat guys with it. Panisi also admitted that he has been banned from all of the casinos in Las Vegas for counting cards.

At this point in the cross-examination, Panisi was questioned regarding his third visit to defendant's home, and he stated that he could not remember what he had said during direct examination regarding this visit, explaining, "I'm serious. I can't. Like I said, I'm not on my drugs now and my memory in and out [*sic*]. I'm not trying to avoid the questions or anything." Panisi then admitted that he was presently not taking either lithium or Halidol. When defense counsel repeated his question regarding Panisi's third visit to defendant's apartment, Panisi indicated that he remembered that he had testified that he saw defendant carry the girl's body in a rug into a green car. He then indicated that the car may have been a tan Toyota instead and stated that he remembered defendant's mother drove a tan car.

Panisi then acknowledged that in 1985 he told a grand jury that the day he saw defendant carry the body to the car was on February 18, 1984. Panisi also testified that on that same night

14

he telephoned defendant at approximately 7:30 p.m. Upon defense counsel's questions, however, Panisi then acknowledged that at about 12:40 p.m., on February 18, 1984, he was arrested by the Chicago police for stealing a car stereo.

On cross-examination, Panisi also admitted that in February 1984 he had a habit of drinking and taking Valium pills which he stole from his grandmother. Panisi also acknowledged that he has been doing drugs for so long that he has no more veins and that he "can't do drugs no more." Panisi indicated that when he visited defendant's apartment in the 1980s he would mostly take LSD. He stated that he did heroin a couple of times but did not like it because it made him "nod out." Panisi indicated that his veins were ruined by the pain medication he injected himself. Panisi stated that he used to steal prescriptions from his doctor and write his own prescriptions for diet pills and other medicines.

Panisi acknowledged that within the last 15 years he also began working as a federal informant. As part of his informant duties, Panisi was paid by handlers to make introductions for people who were trying to buy illegal things. Panisi acknowledged that he "learned that if you gave the government information and they acted on it, they would pay you for it."

On cross-examination, Panisi also admitted that in 2002, he was arrested and convicted for attempted larceny in Nevada for grabbing a person by the neck in front of a restaurant in order to get money. Panisi indicated that before this arrest he lived on the streets of North Las Vegas and slept on cardboard and on a sleeping bag in a field, with his dog. Panisi however averred that now he has a girlfriend and stated that after testifying at trial he planned on living with her.

15

On redirect examination, and over defense counsel's objection,[2] Panisi testified that shortly after he observed Marcy chained to the radiator, he had a conversation with a friend, Michael Reinke, wherein he told Reinke what he had seen in defendant's apartment. Panisi also testified that in 1985 in front of the grand jury he similarly testified to having observed Marcy chained to a radiator in defendant's apartment on Valentine's Day 1984.

Delores "Dori" Garrity next testified that in 1984 Marcy Andrews was one of her best friends. Dori was aware that Marcy planned on going to school somewhere down south in the upcoming semester. Dori testified that on February 13, 1984, Marcy called her and asked her to meet at the bar. The two girls met at Jaime's Elsewhere on Lawrence Avenue, where Dori worked. Dori acknowledged that she knew Marcy had previously been in an alcohol and substance abuse program, but testified that a few weeks before that she had seen Marcy having a few drinks. Dori averred that after meeting Marcy in the bar, the two of them went to Dori's apartment to watch some television. Marcy spent the night at Dori's house.

Dori testified that the next day, February 14, 1984, was unusually warm so the two of them decided to go the botanical gardens to walk. Dori also invited their friend, Gay Dell, who lived in an apartment above Dori to come along. According to Dori, all three of them then "got a ride" to defendant's apartment to buy drugs, because they wanted to "get high and go to the

---

[2]Defense counsel objected arguing that the statements were impermissible bolstering of Panisi's testimony through prior consistent statements; the court overruled the objection following a sidebar, finding that the testimony was admissible to rebut an implication of recent fabrication.

16

botanical gardens." Gay Dell wanted to take "tic" (or THC) and Marcy wanted to smoke marijuana. Dori averred that she and Marcy had done "tic" in the past. According to Dori, Gay Dell had been to defendant's apartment before, but Marcy had not.

Dori testified that once they came to defendant's apartment, she and Gay Dell snorted some "tic" and Marcy smoked some marijuana and had a few beers. Dori averred that the girls eventually changed their mind about going to the botanical gardens and instead remained in defendant's apartment talking. People were coming in and out of the apartment that Dori had not seen in a while and "the day went by." According to Dori, Marcy eventually snorted a little bit of "tic," and the girls then recorded a funny Valentine's Day message on defendant's answering machine. According to Dori, they spent a total of about five to seven hours in defendant's apartment.

At about 7 p.m., defendant offered the girls a ride home in a small white car. While in the car, defendant "lighted up a joint and took a couple of hits and passed it to Gay [Dell] and Marcy." According to Dori, Marcy was sitting in the rear passenger side of the vehicle, and Dori was sitting right in front of her next to defendant. Dori testified that they then got into an accident. Defendant, who had been driving, ran the car into a viaduct on Western Avenue, and Dori's seat slid backwards and injured Marcy's ankle. According to Dori, Marcy's ankle looked broken, and she could not stand on it at all. Dori, who only had a few bruises, offered to take Marcy to the hospital, but defendant "went crazy on us." He started yelling at all three girls, saying "You are all bitches, witches. This is all your fault." According to Dori, defendant was blaming them for the accident and told them he was angry because he did not have insurance.

17

Dori testified that the police then came and took defendant and Marcy with them. Defendant gave Dori and Gay Dell his car keys and some money and told them to wait for the tow truck, while he went to the police station. He told them that he would take Marcy to the hospital afterwards. Dori stated that this was the last time she saw Marcy.

According to Dori, after defendant's car was towed, she and Gay Dell went back to her apartment and tried to call Marcy to see if she was ok. Dori stated that there was no answer at Marcy's apartment. She then called defendant's house and heard the Valentine's message that they had made that afternoon. Dori stated that eventually defendant called her back and asked what had happened to his car and why it had not been towed back to his place. Dori tried to explain that he did not leave them enough money and that the driver took the car to another location, but defendant became angry and screamed at her. Dori asked defendant where Marcy was and if she had gone to the hospital but defendant avoided her questions.

Dori testified that she and defendant exchanged a few telephone calls that night until finally she told him, "I will bring you the keys if I can talk to Marcy." Defendant then put Marcy on the telephone. According to Dori, Marcy did not sound good. She told Dori, "Please get me out of here," and "[h]e's scaring me." Dori explained that Marcy first told her that defendant wanted her to stay the night and that he would take her to the hospital in the morning, but that she then stated "Please get me out of here. I have to get out of here." Dori averred that Marcy's voice sounded scared and frightened, and that she sounded like she was "high," with her speech slow and slurred.

Dori stated that immediately after this telephone call, she and Gay Dell got a ride from

18

John Hefner to defendant's apartment. Dori rang the doorbell but there was no answer. Together with Gay Dell and John Hefner, Dori went across the street to a bar and called defendant's home but there was no answer. Dori continued to call and leave messages on defendant's answering machine, saying, "Open the door. Let me in. If you want your keys, I want Marcy." Dori stated that she could see a shadow walking in the front room of defendant's apartment, but stated that no one ever moved the curtain aside. Dori threw rocks at defendant's window but defendant never answered his door. Eventually, Dori, Gay Dell and John Hefner went home.

Dori continued to call defendant the next day. Once Dori finally reached defendant, she asked him why he would not open the door for her, and he told her that she never came by the house. Defendant asked for his car keys again and told Dori that Marcy had left. Dori did not believe defendant because Marcy could not walk after the car accident, so she told him that she would come to his house and bring his car keys if he let her into his apartment so that she could see if Marcy was there.

Dori testified that she then went again to defendant's apartment together with her brother and Gay Dell. When she rang the doorbell, defendant ran down the stairs to the ground floor screaming at her. According to Dori, although it was very cold, defendant was only wearing pants, a rabbit fur vest and a chain hanging from his neck. Dori asked to go upstairs, but defendant would not let her, threatening that he would kill her and throw battery acid in her face, and indicating that he knew where she and Gay Dell lived. Dori was angry at defendant and she threw his car keys in his face and left.

Dori averred that she then called Marcy's grandmother and mother but was not able to

reach them. Dori continued to call defendant and go to his apartment every day. Toward the end of the week, Dori was finally able to reach Marcy's grandmother, and tell her what had happened. Dori asked Marcy's grandmother to have Marcy's mother call her back. Sara Andrews called Dori after she returned home from a weekend vacation. Dori told her what had happened and asked her to call the police and go with her to defendant's apartment.

On cross-examination, Dori admitted that in 2004 she was convicted of forgery and sentenced to 18 months' probation. Dori acknowledged that she started using THC when she was 17 years old and that she continued to use it into her twenties. Dori also testified that she had tried cocaine, but not heroin. Dori stated that she was a "bad person" and that she made a very big mistake in not calling the police or Marcy's family earlier.

Gay Dell[3] next testified that she knew Marcy through Dori. Gay stated that she spent February 14, 1984, with Marcy and Dori. According to Gay, it was an unusually warm day and the three of them decided to go to the botanical gardens. However, they were first going to get "high," so Dori called defendant and asked if they could come by his apartment to "pick up something." Gay averred that at that time she had met defendant on two prior occasions.

Together with Marcy and Dori, Gay went to defendant's house. Instead of just stopping by and picking up the drugs, the girls ended up spending the day at defendant's house. According to Gay, defendant gave them beer and "tic," and they partied all day long. Gay also recalled that together with Marcy and Dori she made a Valentine's Day recording on defendant's answering machine. Gay testified that throughout the day, people kept coming in and out of

---

[3]Gay Dell testified that at the time of trial her name was Gay Lan.

defendant's house getting drugs. She recognized only two of the men who stopped by the apartment that day–Jeff Wild and Dave Harold. Gay stated that at one point Dori wanted to go home, but that defendant kept asking her to "wait a few more minutes." After a while, Dori told defendant that they would just take a cab, and defendant then agreed to drive them home. According to Gay, defendant was annoyed that Dori wanted to leave with the girls.

Gay testified that once they got into the car with defendant, defendant ran into a viaduct. Gay was not injured, but Dori was bruised, and Marcy kept saying "my foot, my foot, I think I broke my foot." According to Gay, defendant was angry at the three of them, blaming them for the accident and calling them "bitches." Defendant told Dori and Gay that he would take Marcy to the hospital. Marcy went with defendant and Gay went home with Dori.

Gay averred that once at Dori's apartment, she and Dori tried to call defendant's house to see if he had taken Marcy to the hospital but there was no answer, and they kept reaching the Valentine's Day message they had made at defendant's apartment that afternoon. According to Gay, later that night they were able to speak to defendant and then to Marcy. Defendant wanted his car keys returned, and they told him that they would give him the keys if he would let them talk to Marcy. Gay testified that when she finally spoke to Marcy, Marcy told her, "Please come and get me. My ankle hurts. I want to go home." According to Gay, Marcy sounded incoherent and her speech was slurred. Gay testified that Marcy did not sound like this at the time of the accident, and that it therefore appeared to Gay that Marcy was "high" on THC, which she must have taken after the accident.

Gay stated that after she spoke to Marcy at about 10 p.m., she and Dori went to

21

defendant's house on Iowa and Rockwell to try and get Marcy. They rang the bell numerous times but defendant would not open the door. Gay stated that she and Dori then went to a bar across the street and used a pay phone to call defendant, but again got no answer. Gay observed a silhouette pacing back and forth in defendant's second floor apartment. She and Dori threw rocks at the window, but no one answered the door. Gay stated that after that night, she never saw or heard from Marcy again.

According to Gay, a couple of days later, she and Dori went back to defendant's apartment. They rang the doorbell and defendant came flying down the stairs. Gay averred that defendant had no shirt on and was wearing a fur vest and a big medallion on his chest. Defendant screamed at Gay, demanding his keys and saying, "I'm going to kill you. I know where you live. I'll throw battery acid in your faces if you don't give me the keys." According to Gay, Dori then threw the car keys at defendant and the two of them left. Gay testified that she never called the police, which she regrets, but explained that at the time she did not think it was wise "to call the police on a drug dealer."

On cross-examination, Gay admitted that she had "done drugs many times, all the time, for a long time." She explained that she started abusing drugs as a teenager and that she continued to do so into her early twenties. Gay had used marijuana, THC, cocaine and alcohol. When questioned about whether she ever sold drugs, Gay first indicated that she did not. However, after being questioned about her 1987 conviction for delivery and manufacture of a controlled substance, Gay admitted that she pled guilty and was convicted of these two charges. Gay, however, explained that she had never sold those drugs herself, but rather that she had been

arrested together with her boyfriend inside her boyfriend's house, at a time he was selling drugs.

Roger Sexton next testified for the State. Sexton first indicated that he was 44 years old and testified about his prior criminal record. Sexton admitted that in September 2002 he pled guilty to two charges of interstate transportation of stolen property and that he was sentenced to 120 months' imprisonment and 5 months' imprisonment to be served consecutively. Sexton acknowledged that at the time of his testimony he was still serving that sentence in the Pennsylvania Federal Correctional Institution and that after his testimony he would be returned there. Sexton also admitted that in 1997 he pleaded guilty and was sentenced in Illinois to 18 months' probation on a possession of controlled substance charge. At that time, Sexton also pleaded guilty to conspiracy to transport stolen goods and received 38 months' imprisonment and 3 years of supervised release. Sexton testified that in August 2000, he was arrested in Indiana on a warrant for the violation of that supervised release. Sexton further averred that in 1989, he was sentenced to 4 years in the Illinois Department of Corrections for escape, and that in 1994 he served 18 months in an Ohio jail on a breaking and entering charge.

Sexton next testified about his relationship with defendant. Sexton stated that he first met defendant in 1995 in the Federal Metropolitan Correctional Center in Chicago and that they knew each other for only a few months.[4] Sexton explained, however, that he next saw defendant in 1998 when Sexton was sentenced to 38 months' imprisonment in the federal correction facility in Oxford, Wisconsin. Sexton indicated that for the next four years he and defendant saw each

---

[4]At this time, defendant was serving time for a different crime.

23

other on a regular basis. Sexton and defendant would walk together in the prison yard, talk, eat lunch and work out together, lifting weights.

Sexton testified that in the spring or summer of 1998, he had an unusual discussion with defendant, "about a girl." Defendant told Sexton that he had just lost his appeal, and Sexton inquired as to why. Defendant then said, "Well, that bitch is still coming back to haunt me after all these years." When Sexton asked defendant what he was talking about, defendant explained that the judge had sentenced him to too much time and went on to say that "they couldn't find her body, so they know he done it."

Sexton averred that after he was released from prison in August 1999, he continued to see defendant at a halfway house at meals. Sexton explained that defendant was released from prison before him, and that when Sexton went to live in the halfway house, defendant had already moved out, but that he continued to visit Sexton there. Sexton remained in the halfway house for about 3 ½ to 4 months. After that, he lived with defendant for a few weeks. According to Sexton, sometime in November or December of 1999, while living with defendant, Sexton had another "unusual conversation with defendant about a girl." Defendant and Sexton were in a bar on Milwaukee Avenue sometime before 10 p.m., reminiscing about their days in the Oxford penitentiary when defendant started talking about how he should have gotten out of prison earlier. When Sexton asked defendant what he was talking about, defendant said, "I should have been out earlier. I should have won my appeal but the lady shot it down because of the murder charge and the bitch [is still haunting me]."

Defendant then told Sexton that he had been out with a girl and that they had done drugs

together. Defendant told Sexton that they had snorted "tic," but that the girl had thought it was cocaine. Sexton testified that defendant told him that after the girl took the "tic," she became "hysterical, uncontrollable," and that he had to handcuff her to a radiator. According to Sexton, defendant told him that he then had sex with the girl but that she was "a dead f--k." Defendant then told Sexton that afterwards the girl was just "lying on the floor" and was incoherent and that he did not know whether she was alive or dead. Defendant told Sexton that "he had to make sure *** because he couldn't take another hit like that." While saying this, defendant made a strangling motion with his hands. When Sexton told defendant that he should not be talking about these things, defendant replied "Well, I'm not worried about it because they'll never find a piece of the bitch." Sexton admitted that at this time he did not know whether the story defendant had told him was true.

Sexton acknowledged that he did not call the police when defendant told him this story. He averred that the first time he told anyone about what he had heard was when he was arrested by United States marshals in Indiana on August 22, 2000, for violation of his supervised release. Sexton admitted that he told the United States marshals what defendant had told him because he was angry at defendant. Sexton believed that defendant had told the United States marshals where Sexton was, and therefore, while riding in the car with the marshals he stated, "Imagine that a guy who goes around bragging about killing a girl is telling on me."

Sexton testified that he received no deals or promises for his testimony in the present case, but acknowledged that the Assistant State's Attorney did tell him that he would write a letter to the United States Attorneys' office telling them about Sexton's cooperation in the

present trial. Sexton admitted that he was eligible for a period of 21 to 27 months' imprisonment for his violation of the supervised release, but that at sentencing he received only 14 months with drug treatment. Sexton further stated that he also had a possession of a controlled substance case pending at that time, and that although no promises or deals were made with respect to that case, in return for his testimony in defendant's trial, that case was nol-prossed in November 2000, while Sexton was in federal custody.

On cross-examination, Sexton admitted that he escaped from electronic monitoring and home confinement in Cook County, but stated that no charges related to the escape or home confinement violation were ever brought against him. Sexton also admitted that he had heroin when he was arrested on August 22, 2000, but that no charges were ever brought for that as well. Sexton also admitted that he later found out that defendant had not turned him in to the United States marshals.

On cross-examination, defense counsel asked Sexton whether in 1998 he "got his hands" on a 15-page document prepared by the federal government in prosecuting defendant, from which he put together the evidence to which he testified in court. Sexton indicated that he had never seen or read any such document, or any paperwork on defendant's case, for that matter, at all. Sexton, however, then acknowledged that he did not immediately go to the authorities when defendant first told him about the crime and that he waited until 2000 when he was arrested for his violation of probation, to tell Federal Marshal, John Ambrose. Sexton stated that he initially thought that he was arrested because defendant had "turned him in" and that Federal Marshal John Ambrose had led him to believe so. Sexton, however, testified that "regardless, after I

26

found out that [defendant] – you know, I mean that he really did do this to the girl, that's when I decided to turn because I thought he was lying about it." When defense counsel asked Sexton who told him that defendant had "really done this," Sexton indicated that it was the police.

Michael Reinke next testified that in 1984 he was friends with Panisi, who then went by the name of "Gymshoe." Reinke explained that he and Panisi grew up in the same neighborhood around Chicago and Western Avenues. According to Reinke, sometime in February 1984, he had an unusual conversation with Panisi in the Ideal Liquors tavern on Chicago and Damen. Over defense counsel's renewed objection to this line of questioning Reinke was permitted to testify that on that night in the tavern, Panisi told him that he had seen a girl "tied up" to a radiator. Reinke also recalled that Panisi said something about a red sock in the girl's mouth. Reinke told Panisi to call the police if he wanted to and to stop talking about it. Reinke acknowledged that at that time he was getting ready to go to prison himself on an aggravated battery conviction.

David Harold next testified that in 1984 he met defendant through Dori Garrity. Harold stated that he also met Marcy Andrews and Gay Dell through Dori. In 1984 Harold had known Marcy for about two or three years. Harold testified that in the afternoon of Valentine's Day 1984, he went to defendant's apartment on the second floor at Iowa and Rockwell to buy drugs. Harold saw defendant, Marcy, Gay and Dori there. Harold only stopped by for a few minutes, bought drugs and left.

Harold further testified that on the following day he returned to defendant's apartment for more drugs. At about 4:00 or 4:30 p.m., Harold was on his way to work at Mack Truck, on the

27

south side of Chicago, and stopped by defendant's apartment only for a few minutes. Harold's mother-in-law, who also worked at Mack Truck, remained in Harold's car, while Harold went up to defendant's apartment to buy the drugs. Harold averred that once in the apartment, he saw Marcy naked on the bed. Marcy got up and started to walk toward Harold, but she was stumbling, and Harold could tell she was "messed up," from having taken "tic." Harold testified that he told defendant to give Marcy some milk or orange juice because he had heard that would help someone who was "high" on "tic." Harold averred that he left soon thereafter because he had to go to work, but that he told defendant to make sure to take care of Marcy, and defendant said that he would.

On cross-examination, Harold admitted that in 1984 he was a "tic" and cocaine user and that he would frequent Montrose Harbor to buy drugs and meet other people. Harold also acknowledged that he knew that Marcy, Dori and Gay frequented Montrose Harbor for the same reason. Harold admitted that he never saw Marcy chained to a radiator or tied up in any way.

Defendant's ex-wife, Debra Krystyn, next testified that in February 1984 she was married to defendant. In February 1984, she and defendant had been separated for about a month and a half, and she was not living with him in the second-floor apartment at 2558 West Iowa. Krystyn and defendant got back together for a short period of time later that spring. Krystyn testified that while she was married to defendant, he owned five cars and a motorcycle. Krystyn averred that defendant's mother owned the building where defendant lived and that she herself lived on the first floor. According to Krystyn, defendant's mother owned a vehicle too. Krystyn also testified that prior to February 1984 defendant owned a pair of handcuffs but that after February of that

year she never saw them again. Krystyn finally acknowledged that there was a radiator in the kitchen of defendant's apartment close to the window. After the testimony of Krystyn, the State rested.

Defense counsel called Fred Moreno as his only witness. Moreno testified that he is currently employed as an investigator for the Cook County State's Attorney's office, but that in 1984 he worked as a Chicago police officer. Moreno testified that at 12:50 p.m., on February 18, 1984, he arrested Michael Panisi and placed him in custody for the theft of a car radio.[5] Moreno averred that when he arrested Panisi and took him to the police station, Panisi at no time told him about having seen a body or a woman in a drugged condition.

Moreno also testified that around 12:50 p.m. on February 18, 1984, together with Panisi he also arrested Michael Reinke. According to Moreno, Reinke did not tell him anything about a woman who was in trouble or a woman who was handcuffed to a radiator. After Moreno's testimony the defense rested.

The State and defense counsel then presented closing arguments. After hearing all the evidence in the case, the jury found defendant guilty of first degree murder and also concluded that the victim was killed in the course of the felony of aggravated kidnaping.

Following defendant's conviction, on August 29, 2005, the defense subpoenaed Michael Panisi's military records and requested a continuance in order to file a posttrial motion. During a

---

[5]Moreno was called by defense counsel to confirm that he had arrested Panisi on February 18, 1984, and that at the relevant time Panisi was in jail. As noted above, on cross-examination, Panisi testified that he saw Marcy's body in a rug in defendant's apartment on February 18, 1984.

hearing on that continuance, defense counsel informed the court that Panisi's military records were subpoenaed after trial because the State had provided no notice of Panisi's military service to defendant prior to trial. The assistant State's Attorney denied knowing Panisi's military service prior to trial, and indicated that he first spoke to Panisi after Panisi was flown to Illinois from Las Vegas for the trial. The assistant State's Attorney stated that he only became aware of Panisi's military service after jury selection and that he assumed that because defense counsel had interviewed Panisi in Las Vegas two months before trial, defense counsel was entirely apprised of Panisi's military record. The court granted defense counsel's motion for a continuance.

On September 28, 2005, defense counsel filed a motion for new trial pursuant to section 116-1 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/116-1 (West 2000), and pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2000). To this motion for a new trial, defendant attached, *inter alia*, copies of Panisi's military records and defense counsel's correspondence with the relevant military authorities, which revealed that contrary to his testimony at trial, Panisi never became a "green beret," never served three tours in Vietnam, and in fact never left the United States. The records reveled that Panisi enlisted in the army on May 19, 1971, at the age of 17. The records further revealed that in the summer of 1972, Panisi disappeared and went "absent without official leave" (AWOL) for almost three months. As a result, Panisi was served with court-martial charges, and after conferring with JAG counsel, on June 13, 1972, requested a voluntary discharge from the military "for the good of the service." Instead, Panisi received an undesirable discharge in lieu of

a court martial. Panisi later petitioned to have this undesirable discharge converted to a general discharge, but his request was denied by the Army Discharge Review Board on March 1, 1982.

At the hearing on defendant's motion for a new trial, pursuant to a subpoena the State presented the testimony of defense counsel's investigator, Quentin Hall. Hall testified that he accompanied defense counsel to Las Vegas and was present when defense counsel interviewed Panisi on June 27 and June 28, 2005. Hall stated that he did not remember Panisi saying anything about his military background during those interviews. At the State's request, Hall also produced a "case status" memorandum which he had prepared regarding the interview and tendered it to the court. This document, however, revealed no mention of Panisi's military record.

After hearing arguments by both counsel regarding the motion for a new trial, the circuit court denied defendant's motion. In doing so, the court did not specifically address any of the motion's allegations, but simply stated, "There were no errors that require a new trial. The motion for new trial is denied."

At the subsequent sentencing hearing, the court sentenced defendant to natural life imprisonment, concluding that "the only sentence, in light of the record, that will protect the public and be of any rehabilitative benefit to defendant is either his death or lifetime incapacitation. Of the two, only incapacitation is allowed by law." Defendant now appeals.

## I. ANALYSIS

### A. Sufficiency of the Evidence

We first address defendant's contention that the State failed to prove him guilty of first

degree murder beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Hall, 194 Ill. 2d 305, 330, 743 N.E.2d 521, 537 (2000). The weight to be given the testimony, the credibility of the witnesses, the resolution of conflicting testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. People v. Walensky, 286 Ill. App. 3d 82, 97, 675 N.E.2d 952, 962 (1996); People v. Milka, 211 Ill. 2d 150, 178, 810 N.E.2d 33, 49 (2004). A reviewing court will not set aside a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify reasonable doubt of the defendant's guilt. Hall, 194 Ill. 2d at 330, 743 N.E.2d at 537.

In the present case, defendant's sufficiency of evidence argument is predicated solely on his contention that the State failed to present evidence that satisfies the *corpus delicti* rule. Specifically defendant asserts that the State failed to present sufficient evidence independent of defendant's own confession, *i.e.*, his third-party statements to Panisi and Sexton, which tend to prove the existence of the crime--Marcy's death. The State initially argues that the requirement of a *corpus delicti* is inconsistent with the constitutionally-based standard of review for sufficiency of evidence as articulated in Jackson v. Virginia, 443 U.S. 307, 317-18, 61 L. Ed. 2d 560, 99 S. Ct. 2781, 2788-89 (1979), and adopted by our supreme court and that therefore we should abolish it. Alternatively, the State contends that even with the *corpus delicti* rule in place, defendant's conviction must stand. For the reasons that follow, we find that the evidence presented at trial satisfied the *corpus delicti* rule and was sufficient to find defendant guilty of

No. 1-05-3645

first degree murder.[6]

We first note that our supreme court has explained the notion of *corpus delicti* in the following manner:

"Proof of guilt for a criminal offense may be divided conceptually into proof that an injury or loss occurred, that the cause of the loss was criminal in nature, and that the accused was the offender (7 J. Wigmore, Evidence §2071, at 524 (Chadbourn rev. 1978).) By common acceptation, the first two components--the occurrence of the injury or loss, and its causation by criminal conduct--are termed the *corpus delicti*; the identity of the accused as the offender, the ultimate issue, is not considered part of the *corpus delicti*. [Citations]. The elements of an offense must, of course, be proved beyond a reasonable doubt." People v. Furby, 138 Ill. 2d 434, 445-46, 563 N.E.2d 421, 425-26 (1990).

In the present case, defendant was convicted of first degree murder. See 720 ILCS 5/9-1(a)(1) (West 2000). As such, in order to establish the *corpus delicti* of the crime, the State was required to prove beyond a reasonable doubt both: (1) the fact of death, and (2) the fact that the death was produced by the criminal agency of some person. See People v. Holmes, 67 Ill. 2d 236, 239, 367 N.E.2d 663, 665 (1977); see also People v. Fuller, 141 Ill. App. 3d 737, 748, 490

_____

[6]Because we find that at trial the State met its burden of establishing *corpus delicti*, we need not consider the State's invitation to dispense with the *corpus delicti* rule in its entirety, which under the doctrine of *stare decisis* would be for our supreme court to determine. See People v. Furby, 138 Ill. 2d 434, 563 N.E.2d 421 (1990); see also People v. Wright, 286 Ill. App. 3d 456, 461 (1996).

33

No. 1-05-3645

N.E.2d 977, 986 (1986).

It is generally held that proof of *corpus delicti* may not rest exclusively on a defendant's extrajudicial confession, admission, or other incriminating statement. Furby, 138 Ill. 2d at 446, 563 N.E.2d at 425-26. Rather, the State must present evidence "*aliunde* the defendant's confession that tends to show the commission of the offense and is corroborative of the circumstances related in the statement." Furby, 138 Ill. 2d at 446, 563 N.E.2d at 425-26, citing People v. Lambert, 104 Ill. 2d 375, 378-79, 472 N.E.2d 427 (1984), and People v. Dalton, 91 Ill. 2d 22, 29, 434 N.E.2d 1127 (1982). "[I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*." (Emphasis in original.) People v. Willingham, 89 Ill. 2d 352, 361, 432 N.E.2d 861, 865 (1982). In such an event, the independent evidence need not establish beyond a reasonable doubt that an offense did occur. Willingham, 89 Ill. 2d at 361, 432 N.E.2d at 865. The determination whether there is sufficient independent proof of the *corpus delicti* is judged by the particular circumstances of the case. Furby, 138 Ill. 2d at 450, 563 N.E.2d at 428, citing People v. Millard, 370 Ill. 214, 218, 18 N.E.2d 211 (1938).

After a review of the record below, we find that in the present case, the evidence independent of defendant's extrajudicial confessions *tended* to prove the commission of the charged offense*, i.e.*, first degree murder, and sufficiently corroborated defendant's confessions so as to permit the use of those confessions to establish the *corpus delicti*. See Willingham, 89 Ill. 2d at 361, 432 N.E.2d at 865.

The record reveals that independent evidence showed that defendant was the last person to be seen with Marcy when she was alive. According to the trial transcript, two witnesses, both Dori and Gay, testified that after a car accident in the evening hours of February 14, 1984, in which Marcy badly injured her ankle so that she could not walk, defendant took Marcy to his home under the pretense that he would take her to the hospital. Both Dori and Gay testified that after avoiding their telephone calls on that same night, defendant finally allowed them to speak to Marcy, who was inside his apartment. Both Dori and Gay testified that Marcy sounded drugged and scared and that she asked them to come and get her out of defendant's apartment. Both Dori and Gay also averred that when they attempted to go to defendant's apartment and find Marcy, defendant first refused to open the door and let them go upstairs to see if Marcy was there and later came downstairs and threatened to kill the girls and throw battery acid in their faces.

Moreover, two eyewitnesses, Panisi and Harold testified that they observed Marcy drugged and naked in defendant's apartment in the days following February 14, 1984. Specifically, Harold, who had known Marcy for about two to three years, testified that on February 15, 1984, he stopped by defendant's apartment to buy drugs and observed Marcy naked on the bed. Marcy got up and started to walk toward Harold but she stumbled. Harold averred that Marcy was "messed up" from having taken THC.

Similarly, Panisi testified that around Valentine's Day 1984, he went to defendant's apartment to buy drugs and observed a naked girl handcuffed to a radiator, who was all "scr--d up on *** drugs." Panisi's testimony regarding the handcuffs was corroborated by defendant's ex-wife, Debra Krystyn, who averred at trial that in the winter of 1984, her husband owned a pair

35

of handcuffs, but that after February 14, 1984, she never saw the handcuffs again. The record further reveals that Panisi testified that when he came to defendant's apartment on the following day, he observed the same girl sitting naked next to defendant on his couch and watched as defendant forced the girl to perform oral sex on one of his customers. Panisi looked in the girl's wallet and saw that her name was "Marcy." When he came to defendant's apartment to buy drugs for a third time, Panisi observed Marcy's body in a blanket or carpet, and then he watched defendant put the body over his shoulder, take it downstairs, and put it inside the trunk of a car.

In addition, Sara, Marcy's mother, testified in detail to the exhaustive efforts she undertook to find her daughter over the years. Sara also testified that Marcy was a girl who kept in constant contact with her family and who was close to her mother. Sara also averred that Marcy had made plans and made efforts to move to Paducah and attend community college near where her aunt lived.

We find that the aforementioned independent evidence sufficiently tended to show that Marcy Andrews did not merely disappear but rather that she was killed sometime between February 14 and February 18, 1984. See Furby, 138 Ill. 2d at 450-51, 563 N.E.2d at 428 (holding that it was not necessary that the independent evidence disprove every possibility, other than theft, that might have explained the disappearance of the case, so as to permit the use of defendants' confessions to prove *corpus delicti* of theft).

We also conclude that the independent evidence strongly corroborated the circumstances related in defendant's incriminating statements to Panisi and Sexton. In that respect we note that our supreme court has held that there is no requirement that the independent evidence and the

details of the confession correspond in every particular detail; rather, what is necessary are facts or circumstances independent of the confession and consistent with the confession that tend to confirm and strengthen the confession. See Furby, 138 Ill. 2d at 452, 563 N.E.2d at 428, citing People v. Lueder, 3 Ill. 2d 487, 489, 121 N.E.2d 743 (1954).

Here, the record reveals that when Panisi first went to defendant's apartment, and observed the naked girl chained to the radiator, defendant told him that the girl had taken THC. This statement was corroborated by Dori and Gay's testimony that when they last spoke on the telephone to Marcy, who was in defendant's apartment, she spoke incoherently and "appeared" to be on "tic." In addition, on the second day at defendant's house, defendant told Panisi that he and the girl were snorting drugs together and that he had tricked the girl by telling her that she was taking cocaine, while in fact she was consuming the much more potent THC. Defendant said that he had tricked the girl because "she screwed up his mama's car," when she grabbed his steering wheel and made him crash it. This statement was corroborated by the testimony of both Dori and Gay, who averred that after the car accident, defendant screamed at them, calling them "bitches," because he blamed them for the state of his car.

Defendant's confession to Sexton is similarly corroborated and strengthened by the independent evidence presented at trial. Defendant told Sexton that he had been out with a girl and that they had done drugs together. Defendant told Sexton that they had taken "tic" but that the girl believed it to be cocaine, and that after she realized it was not, she became "hysterical, uncontrollable," so that he had to handcuff her to a radiator. This statement is corroborated by Panisi's testimony that around Valentine's Day 1984, he observed a girl, whose name was Marcy

and who was drugged, naked and handcuffed to a radiator in defendant's kitchen. Defendant also told Sexton that he then had sex with the girl and that afterward she was "just lying on the floor," incoherent, and that he had to check whether she was alive or dead "because he couldn't take another hit like that." While saying this, defendant made a strangling motion with his hands. This statement is corroborated by Panisi's testimony that on his third visit to defendant's apartment, around Valentine's Day 1984, he observed Marcy's dead body in a carpet or rug, and then defendant taking the body, putting it into the trunk of his car, and driving off.

As such, because the independent evidence both tended to show the commission of the offense and strongly corroborated defendant's confessions, we may consider defendant's confessions in determining whether the State proved *corpus delicti* beyond a reasonable doubt. See Holmes, 67 Ill. 2d at 239-40, 367 N.E.2d at 665 (holding that because the independent evidence need not be sufficient by itself to connect the defendant to the offense, a bartender's testimony that a patron of the lounge was shot while opening the door for someone, together with a stipulation that this patron died as a result of such wounds, was sufficient evidence *aliunde* defendant's confession to permit the use of defendant's confession to establish the *corpus delicti* in murder prosecution); People v. Norcutt, 44 Ill. 2d 256, 263-64, 255 N.E.2d 442, 446-47 (1970) (holding that evidence in arson prosecution, apart from defendant's confession to police, namely, that he lived in the vicinity of the two buildings that caught fire within hours of each other, and that he had previously pled guilty to two indictments of arson committed a year before, tended to show that the crime did in fact occur so as to permit the use of defendant's confession to establish *corpus delicti*); see also Willingham, 89 Ill. 2d at 362, 432 N.E.2d at 865-

66 (holding that in a prosecution for murder and robbery, independent evidence, *i.e.*, eyewitness testimony that a gold Camaro pulled up in the victim's building's parking lot, a man walked out of the car, spoke to the witness about the weather, then entered the victim's apartment and a few minutes later come out of the apartment with another man, then returned upstairs, followed by a "pop noise" and two men fleeing, corroborated defendant's confession, albeit not in every single detail, so as to permit the use of defendant's confession to prove *corpus delicti*).

Applying the aforementioned principles to the case at bar, we conclude that the evidence, when viewed in the light most favorable to the prosecution, was sufficient to establish *corpus delicti*, so as to sustain defendant's conviction of first degree murder. As already discussed in detail above, defendant, in his confessions to Panisi and Sexton, admitted his involvement in the crime. Specifically, defendant told both Panisi and Sexton that he tricked the girl into taking a large dose of the potent and possibly deadly THC. Defendant told both Panisi and Sexton that after the girl took the drugs she became incoherent and started stumbling around the apartment and that he had to handcuff her to the radiator. Panisi actually observed Marcy tied to such a radiator. Defendant then showed Sexton that he killed the girl by strangling her and indicated that he did so because after they had sex he did not know whether she was dead or alive, and he needed to "make sure," "because he couldn't take another hit like that." Moreover, when Panisi observed Marcy's body rolled up in a carpet on his third visit to defendant's apartment, defendant told him, "she's died on me man," and he asked Panisi to help him dispose of the body. When Panisi refused, defendant put the body in the trunk of his mother's car, swore at Panisi and drove off. More overridingly, defendant later bragged to Sexton that he was not

39

worried about being caught "because they'll never find a piece of the bitch." The jurors were made aware of the circumstances under which defendant made the incriminating statements to Panisi and Sexton, as well as the relationship that defendant had with each witness. It was the jury's function to determine the credibility of those witnesses, to resolve any conflicting testimony, and to determine how any flaws in part of a witness's testimony affected the credibility of the whole. People v. Jones, 295 Ill. App. 3d 444, 452, 692 N.E.2d 762, 768 (1998); People v. Cunningham, 212 Ill. 2d 274, 283, 818 N.E.2d 304, 309 (2004). The jurors were free to credit the testimony of Panisi and Sexton and to accept as true their accounts of defendant's confessions, as well as to accept as true the content of those confessions themselves. See Furby, 138 Ill. 2d at 456, 563 N.E.2d at 430.

Moreover, as already noted above, independent circumstantial evidence corroborated defendant's involvement in the crime. Defendant was last seen inside his apartment with Marcy when she was alive. Marcy's friends Dori and Gay testified that while Marcy was at defendant's apartment she talked to them on the telephone, pleading that defendant was "scaring her," and that they "get her out of there." Dori and Gay further averred that when they tried to go to defendant's apartment to see if Marcy was there, defendant would not allow them into his apartment and, instead, threatened to kill them and "throw battery acid into their faces." Dori and Gay both testified that after that they never saw or heard from Marcy again. In addition, Marcy's mother testified to the exhaustive efforts she made in locating her daughter, as well as to Marcy's habit of continually remaining in contact with friends and family. In addition, defendant's confessions as well as the testimony of Dori and Gay provided a motive for

defendant's actions, namely, that defendant wanted to punish Marcy because he believed that she was responsible for the car accident the night before. Viewing all of the evidence in the light most favorable to the State, we cannot say that defendant was not proved guilty beyond a reasonable doubt. Hall, 194 Ill. 2d at 330, 743 N.E.2d at 537.

### B. Ineffective Assistance of Counsel

Defendant next contends that he was denied his right to effective assistance of counsel when counsel: (1) failed to introduce evidence of the theories of defense he advanced in his opening statement, and (2) failed to challenge Michael Panisi's competency to testify as a witness at trial. We disagree.

Whether defendant was denied effective assistance of counsel is evaluated in accordance with the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984) and People v. Bloomingburg, 346 Ill. App. 3d 308, 316-17, 804 N.E.2d 638, 645 (2004). In reviewing claims of ineffective assistance of counsel, we use a bifurcated standard of review, wherein we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel's actions support an ineffective assistance claim. People v. Berrier, 362 Ill. App. 3d 1153, 1166-67, 841 N.E.2d 1117, 1128-29 (2006); People v. Davis, 353 Ill. App. 3d 790, 794, 819 N.E.2d 1195, 1200 (2004). Because the facts surrounding defendant's claim here are undisputed, our review is *de novo*. Berrier, 362 Ill. App. 3d at 1167, 841 N.E.2d at 1128-29.

No. 1-05-3645

The right of the accused to effective assistance of counsel is provided by the sixth and fourteenth amendments of the United States Constitution. U.S. Const., amends. VI, XIV; People v. Conley, 118 Ill. App. 3d 122, 128, 454 N.E.2d 1107, 1113 (1983). Under Strickland, to prevail on a claim of ineffective assistance, defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance so prejudiced the defense as to deny defendant a fair trial. Strickland, 466 U.S. at 687, 80 L. Ed. at 693, 104 St. Ct. at 2064; see also Bloomingburg, 346 Ill. App. 3d at 316-17, 804 N.E.2d at 645.

As to the first prong, defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy. Bloomingburg, 346 Ill. App. 3d at 317, 804 N.E.2d at 645; 3 W. LaFave, J. Israel & N. King, Criminal Procedure §11.10(c) at 715 (2d ed. 1999). The reasonableness of counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, and without hindsight, in light of the totality of circumstances, and not just on the basis of isolated acts. People v. Kelly, 304 Ill. App. 3d 628, 634, 710 N.E.2d 163, 169 (1999). Because effective assistance refers to competent and not perfect representation (People v. Odle, 151 Ill. 2d 168, 173, 601 N.E.2d 732, 734-35 (1992)), mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent (People v. Palmer, 162 Ill. 2d 465, 476, 643 N.E.2d 797, 801-02 (1994)).

In addition, even if an attorney's performance is deemed incompetent, under the second prong of Strickland, defendant must still show that he was prejudiced by counsel's errors.

42

<u>Strickland</u>, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To show prejudice, defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different, *i.e.*, the fact finder would have entertained reasonable doubt as to defendant's guilt. <u>Strickland</u>, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; <u>Bloomingburg</u>, 346 Ill. App. 3d at 317, 804 N.E.2d at 645.

    1. Counsel's Failure to Present Evidence Promised in His Opening Statements

Defendant first contends that defense counsel's failure to present evidence promised in his opening statement was objectively unreasonable. For the reasons that follow, we find that defense counsel's actions constituted valid trial strategy. See <u>Bloomingburg</u>, 346 Ill. App. 3d at 317, 804 N.E.2d at 645.

Specifically, defendant initially contends that in his opening statement, defense counsel suggested that because the State never found or produced Marcy's body, Marcy might not even be dead, but rather "may have wanted to go back to a simpler time in her life," taking advantage of the fact that her birth certificate listed her name as Prather. Defendant contends that counsel's argument was improper because during trial counsel never introduced evidence that Marcy intended to "go back to a simpler time in her life." We disagree.

We find nothing objectively unreasonable in this line of counsel's argument. First, counsel was correct in arguing that Marcy's body was never found, as the State conceded this fact in its opening argument. As the assistant State's Attorney argued, "Ladies, and gentlemen, to this day, nobody has ever found the body of Marcy Andrews. *** You will hear no evidence that she has ever been found." Moreover, on cross-examination, the victim's mother, Sara

43

Andrews, did in fact testify that Marcy's birth name was Prather and that she had been going through a difficult stage in her life, having recently finished an alcohol rehabilitation program, during which time she found and attempted to reach out to her biological father, James Prather. As such, defendant's contention that defense counsel failed to present any evidence of the fact that Marcy may have "wanted to go back to a simpler life" is rebutted by the record and, therefore, simply incorrect.

Defendant next contends that in his opening statements, defense counsel gratuitously referred to a report detailing Marcy's murder, prepared by the federal government for the sentencing of defendant in an unrelated federal counterfeiting charge. Defendant asserts that although counsel attempted to attribute the source of defendant's confession to Sexton to that report, thereby negating that Sexton heard any of the facts from defendant himself, counsel never in fact introduced that report into evidence at trial. A review of the record reveals that counsel did in fact, albeit unsuccessfully, attempt to elicit such evidence at trial and that his actions were strategically made in the hope of negating defendant's third-party confession to Sexton. During his opening argument, counsel argued that Sexton was a "career criminal" who found out "some dirt" about defendant and "stored it away for a rainy day." Defense counsel further argued that Sexton had become aware of the details of Marcy's murder, as well as the details of defendant's counterfeiting case, not by hearing them from defendant, but "through the prison grapevine." Later in his argument, counsel stated that "there is a way that Roger Sexton found out everything Michael Pan[isi] had to say, and you are going to hear that during the course of the trial." Later during trial, defense counsel did in fact attempt to elicit this information. First on cross-

44

examination, defense counsel questioned Sexton as to his prior convictions and criminal record.

Defense counsel then asked Sexton whether in 1998 he "got his hands" on a 15-page document

prepared by the federal government in prosecuting defendant,[7] from which he put together the

evidence to which he testified in court. Although Sexton indicated that he had never seen or read

any such document, or any paperwork at all regarding defendant's case, he did acknowledge that

he did not immediately report defendant to the authorities, but that he waited until 2000 to do so,

after he became angry at defendant, mistakenly believing that defendant had "turned him in," and

after "the police officers" told him that defendant "had really done this."

Defendant nevertheless also contends that in his opening statement, defense counsel

argued that this entire case was driven by the personal ambition of "a young marshal by the name

of John Ambrose who the State should call [as a witness], but I have no control over who they

call or who they don't," but then never presented evidence to that effect. Specifically, defendant

contends that in propounding this theory of defense, on two occasions, counsel indicated that

Ambrose would testify at trial: first, counsel stated that Ambrose would tell the jury about how

under the guise of a ruse he arrested and then spoke to defendant and, and then later, that

Ambrose would tell them that while federal marshals generally do not participate in state murder

investigations, he received special permission from his supervisor in this case. Counsel

expanded upon Ambrose's role in the investigation, suggesting that his ambition drove a dormant

investigation forward and led to the search of defendant's mother's farm and ultimately,

---

[7]The record reveals that this document would have included, *inter alia*, the 1985 grand

jury testimony of Michael Panisi.

defendants' arrest. Defendant asserts, however, that counsel's failure to call John Ambrose as a witness was objectively unreasonable and that he was prejudiced when John Ambrose did not testify at trial, on behalf of either the State or the defense. We disagree.

We first note that although we agree with defendant that counsel's failure to fulfill his promise to present evidence referred to in his opening statement can constitute ineffective assistance of counsel (see People v. Chandler, 129 Ill. 2d 233, 246-48, 543 N.E.2d 1290, 1295 (1989); People v. Ortiz, 224 Ill. App. 3d 1065, 1073, 566 N.E.2d 1384, 1389 (1992); People v. Briones, 352 Ill. App. 3d 913, 918-19, 816 N.E.2d 1120, 1124-25 (2004), citing United States. ex rel. Hampton v. Leibach, 347 F.3d 219, 257 (7th Cir. 2003); People v. Patterson, 192 Ill. 2d 93, 735 N.E.2d 616 (2000)), in the present case, contrary to defendant's assertions, counsel's decision not to call Ambrose as a witness was not *per se* unreasonable. We have previously held that defense counsel's decision to call or not to call witnesses is presumed to be a tactical choice which will not support an ineffectiveness claim. See People v. Whittaker, 199 Ill. App. 3d 621, 628, 557 N.E.2d 468, 472-73 (1990); see also People v. Consago, 170 Ill. App. 3d 982, 988, 524 N.E.2d 989, 993 (1988) ("defendant has the burden of overcoming the presumption that a decision to not call a witness is within the realm of trial strategy"). In the present case, defendant has not overcome that presumption.

Here, contrary to defendant's assertions, some evidence of the investigation being driven by Federal Marshal John Ambrose was introduced at trial through the cross-examination of Sexton. While cross-examining this witness, defense counsel on a number of occasions attempted to elicit from Sexton that Ambrose had tricked Sexton into thinking that defendant had

46

"turned him in," so as to get Sexton, "a career criminal," to get angry and turn against defendant. In addition, on cross-examination, defense counsel attempted to ask Sexton whether he was aware that federal marshals generally do not participate in state murder investigations, but the State's objection to this question was sustained by the court. With this evidence and line of argument, defense counsel was able, at the very least, to plant a seed in the jury's mind negating the credibility of Sexton as a witness and to leave a reasonable doubt in the jury's mind that defendant was being framed by an ambitions federal marshal. In addition, defense counsel may have encountered a problem during trial and may very well have discarded Ambrose as an unfavorable witness, who, being the investigating officer in the case, might potentially lend more support to the State's case than to defendant's.

However, even if we were to hold that counsel's conduct was unreasonable under the present circumstances, in light of the overwhelming evidence of defendant's guilt, discussed in more detail above, we would nevertheless find that defendant cannot satisfy the second prong of the Strickland test. See Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; Bloomingburg, 346 Ill. App. 3d at 317, 804 N.E.2d at 645. The evidence presented at trial was not close. In addition to defendant's detailed confessions to Panisi and Sexton, circumstantial evidence corroborated defendant's involvement in the crime. Defendant was last seen with Marcy when she was alive. Two eyewitnesses testified that they observed Marcy in defendant's apartment and that she was naked, drugged and incoherent. Marcy's friends Dori and Gay testified that while Marcy was at defendant's apartment she talked to them on the telephone, indicating that defendant was "scaring her" and pleading that they "get her out of there." Dori

and Gay further averred that defendant would not allow them into his apartment, and that he threatened to kill them, when they tried to go inside to see if Marcy was there. Dori and Gay both testified that after that they never saw or heard from Marcy again. Moreover, Panisi testified that on his third visit to defendant's apartment, he observed Marcy's body rolled up in a carpet and he watched as defendant put the body inside the trunk of his mother's car and drive off. In addition, Marcy's mother testified to the exhaustive efforts she made in locating her daughter, as well as to Marcy's habit of continually remaining in contact with friends and family. In light of this overwhelming evidence, we find that there is no reasonable probability that but for counsel's failures, the jury would have entertained reasonable doubt as to defendant's guilt. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; Bloomingburg, 346 Ill. App. 3d at 317, 804 N.E.2d at 645.

2. Counsel's Failure to Challenge Panisi's Competency to Testify at Trial

Defendant also contends that he was denied effective assistance of counsel because counsel failed to challenge the competency of the State's key eyewitness, Michael Panisi, to testify at trial, both before trial or in a posttrial motion after the witness's testimony. Specifically, defendant asserts that defense counsel should have challenged Panisi's competency on two grounds: (1) his mental inability to receive correct impressions and to recall testimony given on direct examination, and (2) his inability to appreciate the moral duty to tell the truth. As shall be discussed more fully below, we find that counsel's decision not to challenge Panisi's competency could well have been predicated upon sound trial strategy, since under the current state of the law in Illinois, there was very little chance that Panisi would have been found

incompetent to testify at trial.

In that respect, we note that in Illinois, *all* witnesses are presumed competent to testify. See 725 ILCS 5/115-14(a) (West 2000); see also People v. Sutherland, 317 Ill. App. 3d 1117, 1124, 743 N.E.2d 1007, 1012-13 (2000); People v. Westpfahl, 295 Ill. App. 3d 327, 330-31, 692 N.E.2d 831, 834 (1998). Potential witnesses can be disqualified if they are (1) incapable of expressing themselves concerning the matter at hand, so as to be understood, or (2) incapable of understanding the duty of a witness to tell the truth. See 725 ILCS 1/115-14(b)(1), (b)(2) (West 2000). The burden of proving that a witness is not competent to testify falls upon the party challenging the witness' ability to testify. See 725 ILCS 1/115-14(c) (West 2000).

We first address defendant's contention that counsel should have challenged Panisi's competency because as a result of his past drug use, and his present mental illness, Panisi was mentally incapable of testifying at trial. Specifically defendant asserts that the record shows that Panisi's mental illness and drug abuse revealed that he could not recall events. Defendant contends that on cross-examination, Panisi testified that he could not recall exactly what he had testified to on direct, because he had not taken his "medication" that day, and that he further admitted that he regularly takes lithium and Halidol for his bipolar disorder. We disagree.

Our supreme court has long held that "one mentally affected or ill is not incompetent if he understands the nature of an oath, and has sufficient mental power to give a correct account of what he has seen and heard." People v. Dixon, 22 Ill. 2d 513, 515-16, 177 N.E.2d 224, 225 (1961), citing People v. Enright, 256 Ill. 221, 230-31, 99 N.E. 36 (1912), and J. Wigmore on Evidence §501 (2d ed. 1923). If a witness has the capacity to observe, recollect and

communicate he is competent, despite the mental condition or ailment, and his mental deficiency may be considered only insofar as it affects his credibility as a witness. See Dixon, 22 Ill. 2d at 515-16, 177 N.E.2d at 225; see also People v. Rainge, 211 Ill. App. 3d 432, 446-47, 570 N.E.2d 431, 440 (1991), citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence §601.3 (5th ed. 1990) ("where a witness' mental capacity is called into question, the mental abnormality being inquired of must be relevant to attacking the witness' ability to perceive, record, recollect, or narrate. Otherwise, the question is one not of the competency of the witness, but the credit to be attached to his testimony").

In the present case defendant mischaracterizes the record with respect to Panisi's inability to recollect details as a result of his bipolar disorder. The record reveals that even though Panisi made a single statement during cross-examination as to his difficulty in recalling his earlier testimony on direct examination, after defense counsel refreshed his memory, Panisi immediately recalled his prior testimony and answered defense counsel's questions. In addition, the record nowhere else reflects that Panisi's mental condition affected his ability to perceive, record, recollect or narrate facts. In fact, the record shows that Panisi was able to recall statements that he had made in his grand jury testimony in 1985, nearly 15 years prior to his testimony. As such, we find it improbable that the circuit court would have disqualified defendant based on one lapse in memory and his bipolar disorder. See Rainge, 211 Ill. App. 3d at 446-47, 570 N.E.2d at 440 (holding that witness was properly permitted to testify at trial despite the testimony of a physician that she was suffering from an incident of acute schizophrenic reaction a week after the murders; concluding that any inconsistencies in the witness' testimony, including lapses of

memory on cross-examination, did not show that she was incompetent to testify but, rather, went to her credibility); see also People v. Seel, 68 Ill. App. 3d 996, 1005, 386 N.E.2d 370, 377 (1979) (holding that a witness was properly permitted to testify in murder prosecution of defendant even though she had been hospitalized on four occasions for mental problems, where questions addressed to the witness indicated that she could recall events that occurred on the date of the murder and that she could relate those memories).

In addition, we disagree with defendant's contention that if challenged by counsel, Panisi would have been found incompetent to testify because of his prior drug abuse. We have previously held that "the ingestion of psychotropic medication does not give rise to a *bona fide* doubt as to a witness's competency," and that a counsel's failure to challenge a witnesses competency on that ground does not constitute ineffective assistance of counsel. People v. Fikara, 345 Ill. App. 3d 144, 162, 802 N.E.2d 260, 274 (2003), citing People v. Mitchell, 189 Ill. 2d 312, 331, 727 N.E.2d 254 (2000); see also Dixon, 22 Ill. 2d at 515-16, 177 N.E.2d at 225 (holding that a habitual user of drugs is not rendered incompetent unless his mental capacity is impaired to such an extent that he cannot meet the qualifications of a witness).

Defendant nevertheless contends that defense counsel was ineffective for not challenging Panisi's competency on the grounds of his inability to distinguish between a truth and a lie. In support of this contention, defendant cites to the fact that Panisi lied about his military record. Defendant acknowledges that prior to trial defense counsel could not have known about Panisi's "inability to appreciate the moral duty to tell the truth," but argues that counsel was nevertheless ineffective because "this [inability] might have emerged had a competency hearing been held."

51

We disagree.

Defendant here fails to appreciate the difference between a witness's ability to understand his duty to tell the truth and his decision to ignore that duty. As the court in People v. Mason, 219 Ill. App. 3d 76, 81, 578 N.E.2d 1351, 1355 (1991), stated:

"Section 115-4 suggests that intellectual rather than moral fitness is the true measure of witness competency. The witness competency statute indicates that a witness may be disqualified if she is incapable of understanding the duty to tell the truth [citation], but does not provide that a witness who is unlikely to tell the truth may be disqualified. The latter is a credibility determination best left to the trier of fact."

Moreover, in practice, the competency bar with respect to understanding the difference between a truth and a lie, is very low. See, *e.g.*, People v. Dempsey, 242 Ill. App. 3d 568, 583-85, 610 N.E.2d 208, 218-19 (1993) (nine-year-old victim of sex abuse who testified he did not know the difference between truth and a lie was not automatically found to be incompetent); see also Sutherland, 317 Ill. App. 3d at 1125, 743 N.E.2d at 1012-13 (2000) (six-year-old shooting victim was found competent to testify in prosecution for attempted murder and battery with a firearm, even though she stated that "telling the truth made people 'happy' " and lying made them " 'mad' "); People v. Velasco, 216 Ill. App. 3d 578, 586, 575 N.E.2d 954, 959 (1991) (31-year-old sexual assault victim who was afflicted with Down's syndrome was competent to testify; although confused at times, victim testified that she knew what the truth was and what a lie was and that she would not tell any lies). As such, we conclude that under the present circumstances, counsel could have reasonably concluded that it was unnecessary to challenge Panisi's

competency as any such challenge would have had very little, if any at all, chance of success.

## C. Prosecutorial Misconduct

Defendant next contends that he was denied his right to a fair trial because of several improper remarks made by the prosecutor in closing argument. We disagree.

The first question we must answer is whether this issue has been waived for purposes of appeal. In order to preserve an issue for appeal, defendant must first make an objection to the alleged error at trial and then raise it in a posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124, 1129-30 (1988). Defendant concedes that he failed to properly preserve this issue because even though he raised this issue in his posttrial motion, he failed to object to it at trial. However, he asks this court to review his claim under the plain error doctrine. 134 Ill. 2d R. 615 (a); People v. Herron, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005).

The plain error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error where either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. Herron, 215 Ill. 2d at 186-87, 830 N.E.2d at 479. In the first instance, defendant must prove "prejudicial error," *i.e.,* that there was error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. Herron, 215 Ill. 2d at 187, 830 N.E.2d at 479. Under the second prong of the plain error analysis, defendant must prove there was error and that the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. Herron, 215 Ill. 2d at 187, 830 N.E.2d at 479. In

both instances, the burden of persuasion remains on the defendant. Herron, 215 Ill. 2d at 187, 830 N.E.2d at 479, citing People v. Hopp, 209 Ill. 2d 1, 12, 805 N.E.2d 1190 (2004).

We therefore first consider whether the complained-of prosecutor's remarks were made in error. In addressing this issue, we initially note that the prosecutor is afforded wide latitude in making closing arguments so long as his comments are based on the evidence or reasonable inferences therefrom. People v. Wilburn, 263 Ill. App. 3d 170, 181, 635 N.E.2d 877, 886 (1994). Reasonable inferences deducible from the evidence may be drawn even if they are unfavorable to defendant. Wilburn, 263 Ill. App. 3d at 181, 635 N.E.2d at 886, citing People v. Johnson, 149 Ill. 2d 118, 594 N.E.2d 253 (1992)). To merit reversal, a prosecutor's improper comments must be of substantial magnitude such that they constituted a material factor in the defendant's conviction. Wilburn, 263 Ill. App. 3d at 181, 635 N.E.2d at 886, citing to People v. Morgan, 142 Ill. 2d 410, 568 N.E.2d 755 (1991), *rev'd on other grounds*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 222. Additionally, when a defendant alleges instances of prosecutorial misconduct, a reviewing court will examine the closing arguments of both the State and the defendant in their entirety and will place the objected-to comments in their proper context. People v. Enoch, 189 Ill. App. 3d 535, 548, 545 N.E.2d 429, 438-39 (1989).

Defendant here first contends that he was denied a fair trial when during closing argument the prosecutor improperly shifted the burden of proof to defendant by making the following argument in rebuttal:

"And then he says they didn't call the police officers here, and maybe they didn't call the police officers because if they had called the police officers, those police officers would

have said, oh, all these witnesses the State called are lying. You know, there's something, a document called a subpoena. You get it from the Court. You take the subpoena. You come to the clerk over here. You ask the clerk to stamp it, and then you have your investigator and go and deliver the subpoena to whatever police officer you want, and you can take it to any state that you want. There's a mechanism to bring everyone in. And, you know, they did, too. They brought in Moreno. They don't have a burden to prove anything, but they certainly had the power to bring in police officers if they believed that that was going to contradict any of these witnesses."

It is a fundamental principle of our justice system that the State has the burden of proving beyond a reasonable doubt all the material facts constituting the crime. People v. Carroll, 278 Ill. App 3d. 464, 467, 663 N.E.2d 458, 460-61 (1996). "The burden of such proof never shifts to the accused, but remains the responsibility of the prosecution throughout the trial." People v. Weinstein, 35 Ill. 2d 467, 470, 220 N.E.2d 432, 434 (1966); see also Carroll, 278 Ill. App. 3d at 467, 663 N.E.2d at 461 ("It is improper *** to suggest to the jury that the Sate had no burden of proof or to attempt to shift the burden to defendant").

An exception to this principle has been recognized where a prosecutor comments on evidence in response to comments by defense counsel which clearly invite a response. People v. Hudson, 157 Ill. 2d 401, 441, 626 N.E.2d 161, 178 (1993); People v. Mahaffey, 128 Ill. 2d 388, 425, 539 N.E.2d 1172, 1190 (1989); see also Wilburn, 263 Ill. App. 3d at 182, 635 N.E.2d at 886-87 ("[i]t is axiomatic that a prosecutor may properly respond to comments made by defense counsel which clearly invite response"); People v. Hunter, 331 Ill. App. 3d 1017, 1030, 772

N.E.2d 380, 390 (2002) (holding that a prosecutor's remarks are generally deemed proper if they have been invited or provoked by defendant); see also Enoch, 189 Ill. App. 3d at 548, 545 N.E.2d at 438-39 ("[a] defendant should not be allowed to benefit from his own counsel's misconduct which invited the State's response); People v. Starks, 169 Ill. App. 3d 588, 600, 523 N.E.2d 983, 991 (1988), citing United States v. Young, 470 U.S. 1, 12-13, 84 L. Ed. 2d 1, 10-11, 105 S. Ct. 1038, 1045 (1985) ("the invited response doctrine allows a party who is provoked by his opponent's improper argument to right the scale by fighting 'fire with fire,' in those situations where there are 'instances of impropriety in [the] initial argument' ")). In that respect we note that "reviewing courts in this State have consistently held that comment on the failure of a potential defense witness to testify is permitted when made in response to defense counsel's own reference to the State's failure to call the witness to the stand." People v. Holman, 103 Ill. 2d 133, 151, 469 N.E.2d 119, 128 (1984), citing People v. Smith, 24 Ill. 2d 198, 200, 181 N.E.2d 77, 78 (1962); People v. Izzo, 14 Ill. 2d 203, 213-14, 151 N.E.2d 329, 336 (1958); People v. Wheeler, 5 Ill. 2d 474, 485-86, 126 N.E.2d 228, 234 (1955).

When read in context, it becomes apparent that the State's comments were justifiably made in response to the following remarks made by defense counsel in closing argument:

> "[The State] didn't call one police officer, one federal marshal, one country trooper, one state police officer, one state's attorneys' investigator, one secret service agent, one FBI agent, not one."

Defense counsel continued his argument with a long line of rhetorical questions about what could have been asked of all these potential witnesses who were never called to testify at trial.

Defense counsel then concluded with, "[The State] didn't bring you one minute of testimony from a police officer. Why is that? Why would they do that? Is it because the witnesses they brought in told so many different stories to so many different officers to so many different investigators that if they did, they would get chopped to pieces? They couldn't take that chance." It is apparent from the above that defense counsel was arguing that the State did not call the officers because the incidents described by Sexton and Panisi never occurred and that, pursuing this line of argument, defense counsel demanded that the State explain the officers' failure to testify.

In response to defense counsel's challenge, the State merely reminded the jurors of the power of compulsory process. Moreover, in doing so, defense counsel reminded the jurors of the proper burden of proof by stating that "[defendant] d[oes]n't have a burden to prove anything." As such, because the comments were invited, they cannot be relied upon as error on appeal. See Smith, 24 Ill. 2d at 200, 181 N.E.2d at 78; Izzo, 14 Ill. 2d at 213-14, 151 N.E.2d at 336; Wheeler, 5 Ill. 2d at 485-86, 126 N.E.2d at 234; see also Mahaffey, 128 Ill. 2d at 425, 539 N.E.2d at 1190 (holding that prosecutor's statement during rebuttal closing argument that defendant's innocence was not the only inference that could be drawn from failure of the informant to testify and that defendant could have used compulsory process to secure informant's appearance if defendant truly believed that the informant's testimony would have been exculpatory were invited by defendant's closing argument in which defendant demanded that the State explain the informant's failure to appear at trial; as such, the statements were not made in error); Wilburn, 263 Ill. App. 3d at 184, 635 N.E.2d at 888 (holding that any error in prosecutor's remarks in

rebuttal argument on defendant's failure to call two police officers who allegedly confiscated two knives from defendant approximately one hour before the stabbing with which defendant was charged were invited by defense counsel's comments in closing argument, which suggested that the State did not call the officers because the incident never occurred; the court held that the prosecutor merely reminded the jurors of defendant's power of compulsory process); Holman, 103 Ill. 2d at 151, 469 N.E.2d at 128 (holding that prosecutor's comments concerning defendant's right to the compulsory process of a particular witness who was not called to testify at trial did not warrant reversal for a new trial, where the comments were made in response to the provocation of defense counsel implying that the prosecutors' case would have been compromised had the State called that person as a witness).

Defendant also complains of the following comment made by the prosecutor in his rebuttal argument: "Whatever method he concocted to obliterate her body, he certainly had no taboos about that. No body in this case? Blame him. He's the one who decides the scene of the crime, the time of death, the place of death, the disposal of the body." Defendant contends that with these comments, the prosecutor again shifted the burden onto defendant by essentially inviting the jury to use the fact that Marcy's body was never found *against* him. We disagree. The core of the State's remarks were predicated on evidence presented at trial, namely, defendant's own statement to Sexton that because the police could not find Marcy's body, "they knew he [the defendant] had done it," and that defendant was not worried because "they'll never find a piece of the bitch." Viewing defendant's statements in context, the prosecutor could reasonably infer that defendant admitted that he destroyed or, in the very least, was responsible

for the disappearance of Marcy's body. As such, we find the prosecutor's remarks proper. See Wilburn, 263 Ill. App. 3d at 181, 635 N.E.2d at 886 (a prosecutor may properly make comments that are based on the evidence or reasonable inferences therefrom; reasonable inferences deducible from the evidence may be drawn even if they are unfavorable to defendant).

Defendant next complains of the following comment made by the prosecutor as error: "Who else could have done it? No one just him." Defendant now contends that with this argument, the prosecutor invited the jury to convict defendant for his failure to prove that someone else was guilty of the crime. We disagree.

We first note that defendant takes the aforementioned comment completely out of context. When read in its entirety, it becomes clear that the comment was a proper conclusion drawn by the prosecutor from the evidence presented at trial. The comment read in its entirety is as follows:

> "You can't just look at bits and pieces here and there and knock each thing down. You have to look at everything, how it all fits together. And when you combine it all, ladies and gentlemen, there is absolutely no doubt, no doubt whatsoever in this case that [defendant] killed her. Who else could have done it? No one, just him. That's why he didn't let them come up in the apartment, and that's why he carried her out wrapped in the carpet."

In light of the fact that defendant was the last person to have been seen with Marcy when she was alive, injured, and drugged, and that defendant refused to let Dori and Gay come inside his

apartment despite their continued efforts to do so upon hearing Marcy's plea to "get her out" of defendant's apartment, the prosecutor properly commented on the fact that defendant was the person with the best opportunity to kill her. See Wilburn, 263 Ill. App. 3d at 181, 635 N.E.2d at 886.

Defendant further contends that the prosecutor improperly allied himself with the jury and suggested that defense counsel was biased, when he argued that it was improper for defense counsel to interject his personal opinions into the case, and when he argued:

> "You know what? The State is just people. It's people like you. It's people like
>
> me. It's people like the judge, his Honorable Judge Rickey Jones. It's people like the
>
> court clerk. And yes, its' also police officers and U.S. marshals. And its mostly good
>
> people, people trying to do their jobs like those coroners."

For the reasons that follow, we disagree.

We acknowledge that it is error for the prosecution to "align itself with the jury" as a "thirteenth juror," because this implies that the State is impartial. See People v. Flax, 255 Ill. App. 3d 103, 110, 627 N.E.2d 359, 365 (1993); People v. Vasquez, 8 Ill. App. 3d 679, 681, 291 N.E.2d 5, 7 (1972); People v. Johnson, 149 Ill. App. 3d 465, 468, 500 N.E.2d 728, 731 (1986). However, we find that this is not what the prosecutor did in the present case.

First, defendant takes the prosecutor's comment out of context. When read in its entirety, it becomes clear that the prosecutor made the complained-of remark in his rebuttal argument only in response to defense counsel's statements in both opening and closing arguments that the State

with all its "awesome power" could not find Marcy's body. The record reflects that the prosecutor's comment in its entirety went as follows:

"And there he [defense counsel] went again with the awesome power of the State again in closing argument, the awesome power of the State, the king of England, you now, some thing, some creature with superhuman powers. And if Marcy was alive, then this creature of the State would have found her. And, therefore, she must be alive because this superhuman creature of the State didn't find her, therefore she's dead, this awesome power of the State. Stand up and be afraid. Be in awe of the State.

That's not what the State is. You know what? The State is just people. It's people like you. It's people like me. It's people like the judge, his Honorable Judge Rickey Jones. It's people like the court clerk. And yes, its' also police officers and U.S. marshals. And its mostly good people, people trying to do their jobs like those coroners.

***That's what the State is, and try they did. They tried their best. They tried to find her body, and they didn't because they're not superhuman."

Although the State's reference to "people like you" would best have been avoided, when read in context, that comment does not appear to be designed to portray the State as being a "13th juror," or to "align the State with the jury," but rather to dilute the impact of defense counsel's comments regarding the power and omniscience of the State. As such, this comment was not made in error. See People v. Pineda, 349 Ill. App. 3d 815, 823-24, 812 N.E.2d 627, 635-36 (2004) (holding that prosecutor's comments during closing argument that "society" had an

interest in convicting defendant, and that it would not tolerate senseless violence, did not constitute an improper attempt to align the jury and society with the prosecution; rather when read in context, prosecutor's argument merely emphasized that the State, rather than the victims, had initiated the prosecution); Enoch, 189 Ill. App. 3d at 552, 545 N.E.2d at 441-42 (holding that prosecutor's comments during closing argument referring to " 'each and every one of us, and all our loved ones,' " did not constitute an improper alignment of the prosecution with the jury, or the prosecutor acting as a " 'thirteenth juror' ").

Moreover, even if the prosecutor's remarks were wholly uncondonable, the error incurred would nevertheless have been harmless, when considered in light of the overwhelming evidence of defendant's guilt, discussed in detail above. See Hudson, 157 Ill. 2d at 441, 626 N.E.2d at 178; Mahaffey, 128 Ill. 2d at 425, 539 N.E.2d at 1190; see also Wilburn, 263 Ill. App. 3d at 182, 635 N.E.2d at 886-87; see also Flax, 255 Ill. App. 3d at 110, 627 N.E.2d at 365 (holding that in light of the overwhelming evidence of defendant's guilt presented at trial, any error arising from the prosecutor's remarks in closing argument referring to the prosecutor's "association" with "good men and women jurors" in murder prosecution and reference to defendant as a "bad man," was harmless, despite defendant's contention that remarks were impermissible attempt to align prosecutor with jurors in same "association").

Similarly, we reject defendant's contention that it was error for the prosecutor to argue that defense counsel had inappropriately interjected his personal opinions into the case. The record reveals that in fact it was defense counsel who improperly interject personal opinions into his closing argument, when he stated that he was "shocked" when he read the transcript and

No. 1-05-3645

Panisi's arrest report and discovered that Panisi had been under arrest when he claimed to be at defendant's apartment and when he argued that that situation "amazes me." On both occasions, the circuit court sustained the State's prompt objection to defense counsel's use of personal opinion, but counsel continued to argue in that vein. As a result, in response to defense counsel's improper argument, in rebuttal the prosecutor made the following comment:

> "You know, lawyers are not supposed to inject their opinion because if their opinion is something that you should consider, then you should fairly consider their bias as well and where their motivations to lie ***. When [defense counsel] says I was shocked, consider that he had an obligation to zealously represent just one client, this man here. So, you have to consider the bias, and that's why lawyers' opinion like that should never be injected into the case."

We find that this comment was not made in error but rather in direct and proper response to defense counsel's improper statements. See Wilburn, 263 Ill. App. 3d at 182, 635 N.E.2d at 886-87 ("[i]t is axiomatic that a prosecutor may properly respond to comments made by defense counsel which clearly invite response"); Hunter, 331 Ill. App. 3d at 1030, 772 N.E.2d at 390 (holding that a prosecutor's remarks are generally deemed proper if they have been invited or provoked by defendant); see also Enoch, 189 Ill. App. 3d at 548, 545 N.E.2d at 438-39 ("[a] defendant should not be allowed to benefit from his own counsel's misconduct which invited the State's response); Starks, 169 Ill. App. 3d at 600, 523 N.E.2d at 991.

Because we find no error in any of the aforementioned prosecutorial remarks, we cannot find plain error, and therefore conclude that the issue has been waived by defendant. People v.

63

Precup, 73 Ill. 2d 7, 17, 382 N.E.2d 227, 231 (1978) ("Before plain error can be considered as a means of circumventing the general waiver rule, it must be *** apparent from the record that an error *** was committed").

### D. State's Reliance on Perjured Testimony

Defendant finally contends that he was denied his right to due process and a fair trial when the State relied on perjured testimony to convict him and that, consequently, the trial court erred in denying his section 116-1 posttrial motion (see 725 ILCS 5/116-1 (West 2000)) on these grounds. Specifically, defendant asserts that the State's key witness, Panisi, falsely testified at trial that he served "three tours in Vietnam," and that he was a "beret," and that the State relied on this evidence in closing argument to bolster his credibility. Defendant asserts that considering the fact that Panisi was the only witness at trial to aver that he saw Marcy's body in defendant's apartment, his credibility was a material issue in the trial. The State concedes that Panisi committed perjury, but contends that defendant was not denied his right to due process because the prosecutor had no knowledge of the perjury at trial. For the reasons that follow, we agree.

It is well established that the State's knowing use of perjured testimony to obtain a criminal conviction violates a defendant's right to due process of law. People v. Bowman, 357 Ill. App. 3d 290, 303, 827 N.E.2d 1062, 1075 (2005), citing People v. Olinger, 176 Ill. 2d 326, 345, 680 N.E.2d 321, 331 (1997). "A conviction obtained by the knowing use of false testimony [will] be set aside if there is a reasonable likelihood that the false testimony could have affected the verdict." People v. Thurman, 337 Ill. App. 3d 1029, 1032, 787 N.E.2d 263, 266 (2003). These same principles are also applicable when the State, although not soliciting false testimony,

fails to correct it when it occurs. Thurman, 337 Ill. App. 3d at 1032, 787 N.E.2d at 266.

Defendant is correct when he asserts that it is equally well established that the aforementioned principles apply even where the witness' false testimony goes only to that witness' credibility. Napue v. Illinois, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959). This is because "[the] jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177. However, even under those circumstances, "the State only has an obligation to correct the testimony of a witness when it has knowledge that the witness is mistaken in his testimony." Bowman, 357 Ill. App. 3d at 303, 827 N.E.2d at 1075.

Here there is nothing in the record to indicate that the State knew that Panisi's statements that he was a "beret" and that he served three tours in Vietnam were false. During the hearing on the motion for new trial, when questioned about the State's knowledge of the falsity of Panisi's military record, the prosecutor elaborated:

"First off, the State didn't do anything different than everyone else in this building does everyday, day in and day out. You call a witness. Before you call a witness, you talk to them, you learn a little about his background. You say, 'Where do you work? What do you do? Tell me a little about yourself?' And then, after the witness states his name for the record, you have him talk a little about who he is, what he does. The jury likes to hear a little bit about the person. Everybody does that. And that day after jury selection,

when he said that–And he's the one who volunteered it, you know when he talked about how he walked into the apartment, and he saw Marcy chained to the radiator, he blurted out that 'I've never seen anything like that, not even in Nam.' 'You were in Vietnam?' 'Yes, I was. Three tours.' *Just took him at his word. Didn't think much of it. Didn't think it was really important at all.* It's just part of the background of every civilian witness that we call or police witness day in and day out." (Emphasis added.)

Under the foregoing, there is no basis upon which to presume that the State knew of or condoned Panisi's perjury. Accordingly, the State cannot be charged with the obligation to correct the false testimony of a witness when it does not know that the witness' testimony is false. See Bowman, 357 Ill. App. 3d at 303, 827 N.E.2d at 1075.

Defendant nevertheless cites to People v. Cornille, 95 Ill. 2d 497, 448 N.E.2d 857 (1983) and the cases cited therein, for the proposition that defendant need not establish that the State "knew" its witness testified falsely in order to reverse defendant's conviction. In Cornille, defendant was convicted of arson, primarily on the testimony of the State's witness that, based on the evidence at the scene of the crime, he came to the conclusion that defendant had started the fire in his own apartment with the use of gasoline. Cornille, 95 Ill. 2d at 500, 448 N.E.2d at 859. Nearly two years after defendant's trial, a reporter employed by a Chicago daily newspaper interviewed the state's expert witness, a consultant in fire investigations who had given crucial testimony of the State at trial. Cornille, 95 Ill. 2d at 500, 448 N.E.2d at 859. The expert witness admitted in the interview that he had lied about his credentials as an arson-investigating expert when testifying at defendant's trial as well as at other arson trials. Cornille, 95 Ill. 2d at 500, 448

66

N.E.2d at 859. After publication of the story and based upon this interview, defendant filed a postconviction petition based upon the witness' false testimony at his trial. Cornille, 95 Ill. 2d at 500, 448 N.E.2d at 859. Our supreme court held that under the "unique" circumstances of that case, defendant was entitled to a new trial. Cornille, 95 Ill. 2d at 515, 448 N.E.2d at 866.

In doing so, our supreme court noted the long-established rule, endorsed by our federal courts, that "it is only the *knowing* use of false testimony by the prosecution or other agents of the State which violate due process." (Emphasis added.) Cornille, 95 Ill. 2d at 509-10, 448 N.E.2d at 863, citing United States ex rel. Burnett v. People of the State of Illinois, 619 F.2d 668 (7th Cir. 1980), *cert. denied*, 449 U.S. 880, 66 L. Ed. 2d 104, 101 S. Ct. 229 (1980). The court, however, also noted defendant's citation to the appellate decision in People v. Shannon, 28 Ill. App. 3d 873, 329 N.E.2d 399 (1975), which held that it was not necessary that the defendant show the State had knowledge of the perjured testimony, explaining:

" '[T]he use of the State's judicial process to enforce a right of the People, the violation of which is based upon the perjured testimony of a private individual, constitutes State action whether or not the State knew that the testimony was perjured. Known to the State or not, the use of its judicial process to convict and imprison on perjured testimony is a miscarriage of justice which is abhorrent to fundamental fairness and as such is intolerable.' " Cornille, 95 Ill. 2d at 510, 448 N.E.2d at 864, quoting Shannon, 28 Ill. App. 3d at 878, 329 N.E.2d 399.

Although the supreme court refused defendant's invitation to adopt the approach of the appellate court in Shannon, and applied the more restrictive approach of the federal courts (Cornille, 95 Ill.

2d at 511, 448 N.E.2d at 864), it nevertheless acknowledged the existence of a "due diligence" standard for the use of perjured testimony by the State, by holding that "under certain circumstances the prosecutor should not be permitted to avoid responsibility for the false testimony of a government witness by failing to examine readily available information that would establish that the witness is lying." Cornille, 95 Ill. 2d at 513, 448 N.E.2d at 865.

The court then found that in that case the State's "lack of diligence" was evinced by the fact that the same expert witness had testified on behalf of the State in at least two other criminal trials, and that considering that at defendant's trial he alleged that he had "investigated over 1,300 fires in his 14-year-career as a 'fire investigator' " there was a clear danger that he could have testified in many more. Cornille, 95 Ill. 2d at 513, 448 N.E.2d at 865. The court further found that the expert was "not merely an occurrence witness whose presence at the trial was determined by his relationship to the facts of the case." Cornille, 95 Ill. 2d at 513, 448 N.E.2d at 865. Instead, the court held:

"The State selected him to offer the jury his expert opinion on the causes of the fire and relied upon the credibility imparted by his expertise to win an otherwise closely balanced case. As the prosecution made the mistake of producing an expert witness who was an imposter, it is only fair to charge it with responsibility for the imposter's false testimony." Cornille, 95 Ill. 2d at 513, 448 N.E.2d at 865.

A careful analysis of the decision in Cornille would focus the application of the "due diligence" standard in place of the "knowing use" standard to situations where witnesses are deliberately selected by the State and where the State has latitude to procure the necessary

68

testimony from sources of its own choosing. A typical situation would involve the testimony of an expert witness. There, the State may be charged with responsibility to do a sufficient background check so as to justify the witnesses' qualifications to testify in the area of his professional expertise. This requirement, however, is not readily transferable to occurrence witnesses, where you take the witness as you find him. See Bowman, 357 Ill. App. 3d at 303, 827 N.E.2d at 1075, citing Olinger, 176 Ill. 2d at 345, 680 N.E.2d at 331; see also People v. Jimerson, 166 Ill. 2d 211, 228, 652 N.E.2d 278, 286 (1995); Thurman, 337 Ill. App. 3d at 1032, 787 N.E.2d at 266; United States v. Bagley, 473 U. S. 667, 678-80, 87 L. Ed. 2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985). However, even if "due diligence" were a prerequisite to the testimony of any witness, there is no indication here that the duty was violated, as the witness came into the State's purview only after the jury was selected and before there was sufficient opportunity prior to his testimony to investigate and explore his self-aggrandizing statement.

Moreover, even if the State were accountable for the use of perjured testimony where this use was not made knowingly, nor injected into the trial by reason of the State's lack of "due diligence," the use of that testimony would nevertheless have constituted harmless error in light of the overwhelming evidence of defendant's guilt. See Jimerson, 166 Ill. 2d at 228, 652 N.E.2d at 286 (holding that harmless error analysis applies to allegations of improper use of perjured testimony); Olinger, 176 Ill. 2d at 345, 680 N.E.2d at 331 ("A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. [Citation.] This standard is equivalent to the harmless error standard").

The record reveals that Panisi's credibility was already throughly impeached by defense counsel. The jury was already fully aware of Panisi's drug use, his mental illness, his prior criminal background, his counting-card scams in Las Vegas, and his homelessness. As such, we find it highly improbable that the jury would have set aside all this evidence simply because Panisi stated that he served in Vietnam 30 years before. Rather, the record reveals that Panisi's credibility hinged on the fact that his testimony regarding the crime was corroborated in nearly every respect by other witnesses who testified at trial, namely Sexton, Dori, Gay and Harold. The only additional and different piece of evidence offered by Panisi was his testimony that he observed Marcy's body in the rug in defendant's apartment on February 18, 1984. However, this evidence was already challenged by defendant's witness, Officer Moreno, who testified that in the early afternoon of February 18, 1984, he arrested Panisi for a car stereo theft, thereby raising questions as to whether Panisi could in fact have seen the body wrapped in a rug at defendant's apartment if he had in fact been in police custody on that day. As such, we find that there is no reasonable likelihood that the additional evidence would have had any bearing on the jury's determination of Panisi's overall credibility.

More overridingly, we hold that even without Panisi's entire testimony, the jury was presented with overwhelming evidence of defendant's guilt. As stated above, other than seeing a body in a sheet and seeing defendant take that body to his car, everything else Panisi said was testified to by other witnesses at trial. Testimony by Dori, Gay and Harold established that Marcy was last seen alive in defendant's apartment and that at this time she was injured so as not to be able to walk, and she was drugged and stumbling naked around the place. Dori's and Gay's

70

testimony further established that Marcy was being confined in defendant's apartment against her will, that defendant was "scaring her," and that she had asked her friends to "get her out of there." Moreover, both girls testified that when they attempted to go into defendant's apartment to get Marcy, defendant met them in front of his house so as to prevent them from going up the stairs and into his second-floor apartment, screaming at them, and threatening that he would kill them and throw battery acid in their faces. Similarly, Marcy's mother, Sara, testified to the exhaustive and fruitless efforts she undertook to locate her daughter after Dori had told her what had happened with defendant. Sara also averred that Marcy was the type of girl who always remained in contact with family and friends and that it was entirely out of character for Marcy to disappear and never contact anyone again. In addition, the testimony of Dori and Gay provided a motive for the crime, namely, that defendant expressed great anger after the accident, threatening and blaming the girls for the car accident in which his mother's car was destroyed.

All of this testimony tended to prove that Marcy did not just disappear, but rather that she was killed, and it sufficiently corroborated the incriminating statements defendant made to Sexton, so as to permit the use of those statements in establishing defendant's guilt. Defendant told Sexton that he tricked Marcy into taking a large dose of the potent and possibly deadly THC, and that after the girl took the drugs, she became incoherent and started stumbling around the apartment and that he had to handcuff her to the radiator. This statement was corroborated by Harold, who saw Marcy drugged and naked in defendant's apartment close to Valentine's Day 1984. The statement was further corroborated by the testimony of defendant's ex-wife, who averred that prior to Valentine's Day 1984, defendant owned a pair of handcuffs, but that after

71

this date, she never saw the handcuffs again.  Defendant also showed Sexton that he killed the girl by strangling her and indicated that he did so because he had to "make sure" she was dead, as "he couldn't take another hit like that."  Defendant then bragged to Sexton that he was not worried about being caught  "because they'll never find a piece of the bitch."  In light of all of the aforementioned evidence, we find that there was sufficient evidence to convict defendant even without Panisi's testimony and that, therefore, any error in the State's use of the perjured testimony would necessarily have been harmless.

Defendant alternatively contends that notwithstanding whether there was error by the trial court in denying his posttrial motion, regarding the use of perjured testimony, he was entitled to collaterally attack that judgment under section 2-1401 with newly discovered evidence of Panisi's military records.  For the reasons that follow, we disagree.

A petition for relief from final judgment is the forum in criminal case in which to correct all errors of fact occurring in the prosecution of a case, unknown to petitioner and the court at the time of the trial, which, if then known, would have prevented the judgment.  People v. Gandy, 227 Ill. App. 3d 112, 139, 591 N.E.2d 45, 64 (1992); see also People v. Diehl, 335 Ill. App. 3d 693, 708, 783 N.E.2d 640, 654 (2002), citing People v. Mahaffey, 194 Ill. 2d 154, 181, 742 N.E.2d 251 (2000) ("[t]he purpose of a section 2-1401 petition is to present errors of fact, unknown to the petitioner or the court at the time of trial, that would have caused the court to render a different decision").  Setting aside a judgment on the basis of newly discovered evidence is justified where the petitioner shows both that the new evidence was unknown to him at the time of trial and that he could not have discovered the new evidence with the exercise of

reasonable diligence. <u>People v. Waters</u>, 328 Ill. App. 3d 117, 127, 764 N.E.2d 1194, 1202 (2002). In addition, the new evidence must be so conclusive that it would probably change the result on retrial, must be material, and must be more than merely cumulative to the trial evidence. <u>Waters</u>, 328 Ill. App. 3d at 127, 764 N.E.2d at 1202. A section 2-1401 petition must be supported by "affidavit or other appropriate showing as to matters not of record." 735 ILCS 5/2-1401(b) (West 2000). We will not disturb a trial court's decision to grant or deny relief pursuant to section 2-1401 absent an abuse of discretion. <u>People v. Haynes</u>, 192 Ill. 2d 437, 461, 737 N.E.2d 169, 182-83 (2000).

In the present case, contrary to defendant's contention, we find that the evidence is not so conclusive that it would probably change the result on retrial. <u>Waters</u>, 328 Ill. App. 3d at 127, 764 N.E.2d at 1202. We acknowledge that evidence going to the credibility of a key witness may be material in a criminal case, especially if the credibility of the witness is paramount in the decision of the trier of fact. See *e.g.*, <u>Napue</u>, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177; see also <u>Cartwright v. Goodyear Tire & Rubber Co.</u>, 279 Ill. App. 3d 874, 884, 665 N.E.2d 365, 372-73 (1996). However, here, as already discussed above in our harmless error analysis, in light of the overwhelming evidence presented against defendant at trial, we nevertheless find that the presentation of impeaching testimony establishing that Panisi lied about his military record, is "not so conclusive" as to defendant's innocence that it would be likely to change the outcome on retrial. As such, we hold that the trial court did not abuse its discretion in dismissing defendant's section 2-1401 petition. <u>Haynes</u>, 192 Ill. 2d at 461, 737 N.E.2d at 182-83 .

III. CONCLUSION

No. 1-05-3645

        For the foregoing reasons, we affirm the judgment of the circuit court.

        Affirmed.

        McBRIDE, P.J., and O'MALLEY, J., concur.

No. 1-05-3645

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**
**(Front Sheet to be Attached to Each Case)**

Please use the following form

CASEY NOWICKI,

Defendant-Appellant,

v.

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee.

| | |
|---|---|
| | No. 1-05-3645 |
| Docket No. | |
| COURT | Appellate Court of Illinois<br>First District, SIXTH Division |
| Opinion<br>Filed | August 29, 2008<br>(Give month, day and year) |
| | JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT: |
| JUSTICES | PRESIDING JUSTICE McBRIDE and JUSTICE O'MALLEY concur. |
| | Lower Court and Trial Judge(s) in form indicated in margin: |
| APPEAL from the Circuit Court of Cook County; the Hon Judge Presiding. | Appeal from the Circuit Court of Cook County;<br>The Hon. Rickey Jones Judge presiding.. |
| | Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word FOR NONE if not represented. |
| APPELLANTS<br>John Doe, of Chicago<br><br>For APPELLEES, :<br><br>Smith and Smith of Chicago, | FOR APPELLANT: Brian A. McNeil, Assistant Appellate Defender, Michael J. Pelletier, Deputy Defender, Office of the State Appellate Defender, 203 North LaSalle Street–24th Floor, Chicago, IL 60601<br><br>APPELLEE: Richard A. Devine, State's Attorney, James Fitzgerald, Peter Fischer, Assistant State's Attorneys of Counsel, Cook County State's Attorney's Office, Richard J. Daley Center, Room 309, Chicago, IL 60602 |
| Add attorneys for third-party appellants and/or appellees. | |