NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180224-U

NO. 4-18-0224

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| RYAN C. MORELL, | ) | No. 15CF1009 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

---

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held:*   Trial court's judgment is affirmed because defendant failed to establish he was
prejudiced by his trial counsel's alleged ineffectiveness.

¶ 2   On April 19, 2017, a jury convicted defendant Ryan C. Morell of two counts of

aggravated criminal sexual abuse. On August 9, 2017, the trial court sentenced defendant to two

consecutive four-year terms of imprisonment. Defendant appeals, arguing his trial counsel was

ineffective for failing to seek the redaction of certain statements made by the child victim in this

case, which defendant argues suggested to the jury defendant also sexually abused his four-year-

old son. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4   On August 24, 2015, the State charged defendant by information with two counts

of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)) for knowingly

committing an act of sexual conduct with J.T. (born March 18, 2005) between January 1, 2015, and August 17, 2015, and on or about August 18, 2015. The information alleged defendant had J.T. place her hand on defendant's penis for the purpose of the sexual gratification or arousal of J.T. or defendant.

¶ 5        On April 4, 2016, the State filed a motion pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)) to allow hearsay statements made by J.T. to P.G. (J.T.'s minor cousin), Erin M. (J.T.'s mother), Marcia Sleeth (J.T.'s grandmother), Allan Sleeth (J.T.'s grandfather), and Department of Children and Family Services (DCFS) caseworker Lanay Walls, regarding sexual acts defendant made her perform on him. The State also sought to introduce J.T.'s video recorded interview with Walls. The State later amended the motion on May 4, 2016, to include statements J.T. made to her aunt, Rebecca Gillum.

¶ 6        In July 2016, at a hearing on the State's motion to admit the hearsay statements, defense counsel agreed J.T.'s statements to P.G., Erin, Marcia, and Allan met the criteria for admissibility set out in section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)). Defense counsel did object to Rebecca Gillum's proposed testimony regarding a statement J.T. made to her. As for J.T.'s recorded interview with Walls, defense counsel did not object to it being played for the jury. The court ruled it would allow evidence regarding J.T.'s statements to P.G., Erin, Marcia, and Allan, but not Rebecca. The court also ruled J.T.'s recorded interview would be allowed.

¶ 7        In April 2017, defendant's jury trial began. J.T. testified defendant was her stepfather. She and defendant got along when he first moved in with J.T. and her mother. However, after her brother, C.M., was born, defendant started making fun of J.T., calling her fat

and a pig. The name calling became worse and never really stopped until defendant was arrested.

¶ 8　　　　　According to J.T., on July 5, 2014, she was on the couch at her home watching television. Defendant sat beside her, exposed his penis (which J.T. referred to as defendant's "hog"), and explained to J.T. how men and women use a man's penis. Defendant then stood up from the couch and acted like everything was normal. On another occasion, defendant sat down next to J.T. on the couch and put a brown blanket over his lap. He then made J.T. rub what he said was his leg. J.T. testified she knew it was not defendant's leg but instead was his penis. She indicated defendant had her move her hand in an up and down motion on his penis for about five minutes. This happened four other times—three times total in the living room and two times in her bedroom. During the incidents in her bedroom, defendant laid next to J.T. on her bed and covered his lap with a pink blanket she had in her room. The last incident ended when defendant got up from her bed and went downstairs because J.T.'s mom was starting to come upstairs, asking what was taking so long.

¶ 9　　　　　According to J.T., the morning after the last incident in her bedroom, J.T.'s mother drove J.T. and C.M. to J.T.'s maternal grandmother's house, where they were going to spend the day. J.T.'s mom was speaking to defendant on the speakerphone. When J.T.'s mom asked defendant why he was upstairs so long the night before, defendant said he and J.T. were talking about how J.T.'s day went. Defendant did not mention anything about J.T. rubbing defendant's penis. J.T. thought this was odd. J.T.'s mom noticed J.T.'s reaction and asked J.T. why she was making faces during the phone call. J.T. did not tell her mom what had happened.

¶ 10　　　　While J.T. was at her grandmother's house, she asked her grandmother whether it was normal for a daughter to rub her father's "hog." Her grandmother took J.T. to another room where the younger kids could not hear their conversation. J.T. then told her grandmother what had

happened with defendant.

¶ 11 J.T. testified she also told her younger cousin, P.G., about earlier incidents of defendant's abuse before she told her grandmother. According to J.T., she did not tell an adult sooner because she did not know if defendant's actions were normal. She told her grandmother because defendant had not mentioned the abuse during the phone call with J.T.'s mother. J.T. testified defendant did other things that made her feel uncomfortable, including grabbing her butt and rubbing his penis against her butt.

¶ 12 On cross-examination, J.T. testified her uncle Shawn was not at her house the last time defendant made her masturbate him. When asked whether any liquid came out of defendant's penis or whether it felt wet, J.T. said "it wasn't like soaked or anything, it was just damp." This did not happen every time but it did happen during the incidents in her bedroom.

¶ 13 P.G. (born November 6, 2006) testified J.T. is her cousin and Marcia Sleeth is her grandmother. Before defendant was arrested, P.G. and J.T. had a conversation at their grandmother's house. J.T. looked worried and scared. J.T. asked P.G. whether she put lotion on P.G.'s father's legs. P.G. said she did. J.T. then told P.G. defendant asked J.T. to rub "oil stuff" on his penis. P.G. told J.T. she should tell their grandmother. J.T. did not want to because she was scared. P.G. promised J.T. she would not tell anyone what J.T. told her. It is not entirely clear when this conversation occurred, but it was not the day J.T. eventually told her grandmother about the abuse.

¶ 14 Marcia Jean Sleeth, J.T. and P.G.'s grandmother, testified she was babysitting J.T., P.G., and some other children on August 19, 2015. J.T. sat next to Marcia and asked if J.T.'s mother ever rubbed J.T.'s grandfather, Allan Sleeth. Marcia said, "No." Based on the look on J.T.'s face, she took J.T. to another room to get away from the other children. J.T. told Marcia

that defendant had J.T. rub "his leg." Marcia asked J.T. to show her what J.T. was talking about. J.T. pointed to her groin area. J.T. said she knew it was not defendant's leg she was rubbing. J.T. said it occurred five times, including the night before. J.T. also said she had told P.G. about prior incidents. J.T. asked Marcia not to tell anyone because she did not want her mom and defendant to get a divorce. Marcia said she had to tell. Marcia then called her husband, Allan Sleeth.

¶ 15        Allan Sleeth, a retired police officer for the City of Decatur, testified he was Marcia's husband and J.T.'s grandfather. On August 19, 2015, he was at work when his wife, Marcia Sleeth, called between 8 and 9 in the morning and told him what J.T. had said. Allan then picked up J.T.'s mother, Erin M., at her place of employment and told her what J.T. had said. He and Erin then went to the Sleeth residence. They first talked to P.G. outside the home. Allan asked P.G. if J.T. had told her any secrets. P.G. said, "Yes." After talking to P.G., Allan sent her inside and had J.T. come outside. J.T. told Allan and Erin that defendant had J.T. rub his penis. J.T. said it had happened five times. After talking with J.T., Allan reported defendant's conduct to the Macon County Sheriff's Office.

¶ 16        Erin M., J.T.'s mother, testified she had been married to defendant at the time of the abuse. On August 19, 2015, she was taking J.T. and C.M. to her mother's house before going to work. On the drive, she talked with defendant on the speaker phone in the car. J.T. could hear the conversation. Defendant said he was not going to be able to work because of the weather so he would pick up the children at the Sleeth home. J.T. said she did not want to go with defendant. During the call, Erin commented on how long it took defendant to come to bed the night before. Defendant said he went to C.M.'s room to put him in bed and then went to J.T.'s room to talk to her about cheerleading and school. When defendant said this, J.T. clenched her body and looked out the window. Erin said she knew something was wrong because J.T.'s reaction was unusual.

After Erin ended the call, she asked J.T. if everything was alright and if defendant was being nice to her. J.T. said it was fine and kept looking out the window. Erin did not push J.T. for more information.

¶ 17 While at work, Erin received a call from her father, who said he was coming to talk to her. When her father arrived, he told Erin what J.T. told Marcia about defendant. Erin was present when Allan spoke with P.G. and J.T. J.T. told Erin and her father defendant had J.T. rub his penis on five different occasions. After speaking with J.T., they went to the police station.

¶ 18 Erin testified the pink blanket, which J.T. said defendant covered his lap with in J.T.'s bedroom, was usually in J.T.'s room. Erin testified she did not like the blanket. She also testified she and defendant had never had sex on that blanket or used it to wipe herself or defendant off after having sex.

¶ 19 Marcia Pistorius testified she is defendant's mother. She talked with defendant after he had been arrested. Defendant said he did not do what he was accused of doing. Instead, according to Marcia, defendant said he laid down on J.T.'s bed with her to help her go to sleep and J.T. started touching him. Defendant told her it was J.T.'s fault. Marcia told defendant she did not believe him.

¶ 20 Detective Matt Whetstone of the Macon County Sheriff's Office testified he was assigned to assist in the investigation. On August 19, 2015, he viewed J.T.'s interview with a caseworker from DCFS at the Child Advocacy Center in real time from a separate room. The recording of J.T.'s interview was then played for the jury. In the interview, J.T. said defendant had her rub his penis on five separate occasions, the last time being the night before. During the interview, J.T. mentioned defendant covered his lap with a pink blanket she had in her room when she rubbed his penis. J.T. was asked about defendant in relation to C.M. and C.M.'s penis.

Whetstone testified the pink blanket and another blanket were collected from J.T.'s home. The pink blanket was sent to the crime lab. Whetstone acknowledged J.T. never said defendant ejaculated. The pink blanket was later tested, semen was found, and a DNA profile from the semen matched defendant's DNA.

¶ 21 Defendant called Shawn Morell, defendant's brother. Morell testified J.T. and defendant had a good relationship. Defendant treated her like she was his biological child. Morell testified he was at defendant's house on August 18, 2015, the night before defendant's arrest. The last time he saw Erin M. that night was at 9:30 p.m. She was sitting on the bed in her and defendant's downstairs bedroom looking at her phone.

¶ 22 Defendant testified he had a good relationship with both C.M. and J.T. He admitted telling J.T. to quit being a "pig" if she was eating a lot of food and to stop acting "retarded." According to defendant, J.T. was jealous of his relationship with C.M. because he spent a lot of time with C.M. He denied telling his mother that J.T. initiated the sexual conduct with him. As for the pink blanket on which his semen was found, defendant stated the blanket had been all over the house, including his and Erin's bedroom, and he could have wiped himself off with the blanket after he engaged in some sort of sexual activity with Erin. He did not specifically remember using the blanket to wipe himself off. He denied J.T.'s allegations against him.

¶ 23 After the defense rested, the State called Erin M. back to the stand. She testified Shawn Morell was not at their home on August 18, 2015, from 4:30 p.m. to 9:30 p.m.

¶ 24 The jury found defendant guilty of both counts of aggravated criminal sexual abuse. On August 9, 2017, the trial court sentenced defendant to two consecutive four-year sentences.

¶ 25 This appeal followed.

¶ 26 II. ANALYSIS

¶ 27        Defendant argues his trial counsel was ineffective because he failed to request the removal of what defendant claims was highly prejudicial other-crimes evidence suggesting defendant sexually abused J.T.'s four-year old brother.  At issue is the following exchange between J.T. and the interviewing caseworker:

"CASEWORKER:  Have you ever seen [defendant] in a closed room with [C.M.]?

J.T.:  Not unless Mom is in there.

CASEWORKER:  Ok. Do you know how [C.M.] got his hog swollen?

J.T.:  [No.]

CASEWORKER:  Ok.

J.T.:  [Defendant] just said that when we were in the room, I kind of saw what it looked like.  And around this kind of area is was kind of blueish-reddish.

CASEWORKER:  Mhmmm.

J.T.:  And [defendant] said it was probably from his underwear because he does have tight underwear.

CASEWORKER:  Ok.

J.T.:  But I don't know anything else."

Defendant argues this exchange suggested defendant was under investigation for violently sexually abusing C.M. and his trial counsel's failure to move to redact this exchange from the interview before it was played for the jury was objectively unreasonable and deprived him of a fair trial.

¶ 28        For a successful ineffective assistance of counsel claim, a defendant must demonstrate (1) defense counsel's performance fell below an objective standard of reasonableness *and* (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy *Strickland's* deficiency prong, a defendant must demonstrate his

attorney made errors so serious and his performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999). Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163.

¶ 29        To satisfy the prejudice prong, a defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1164.  "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced."  *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526.  When a case is more easily decided on the ground of a lack of sufficient prejudice rather than the reasonableness of counsel's representation, the court should do so. *Strickland*, 466 U.S. at 697.  We apply a *de novo* standard of review when determining whether a defendant's trial counsel was ineffective. *People v. Nowicki*, 385 Ill. App. 3d 53, 81, 894 N.E.2d 896, 923 (2008).

¶ 30        Based on the evidence in this case, we need not determine whether defense counsel's failure to object to the portion of J.T.'s recorded interview at issue fell below an objective standard of reasonableness because a reasonable probability does not exist the result in this case would have been any different if the jury had not heard the brief exchange between the interviewer and J.T. about defendant and her brother's penis.  J.T. did not accuse defendant of doing anything to C.M.  In fact, she stated she had never seen defendant alone in a closed room with C.M.

¶ 31        In his brief, defendant argues the exchange between J.T. and the caseworker

regarding C.M.'s penis encouraged the jury to make highly prejudicial observations and assumptions that defendant sexually abused C.M. or, at least, was under investigation for sexually abusing him. This is merely speculation on defendant's part and does not establish any actual prejudice in this case.

¶ 32    More importantly, the jury was able to see the rest of J.T.'s interview, which defendant does not argue was inadmissible. During that interview, J.T. testified defendant had made her rub his penis on five different occasions. During the last incident, which occurred in J.T.'s bedroom, J.T. said defendant covered his lap with a pink blanket J.T. had in her bedroom. The police recovered the pink blanket from J.T.'s bedroom, and defendant's semen was found on the blanket.

¶ 33    Defendant attempted to explain away the presence of his semen on J.T.'s blanket by saying he might have used the blanket to clean his penis after having sex with Erin M. However, defendant did not remember doing so. Further, Erin M. contradicted defendant's explanation, saying she and defendant had never used the blanket in the way defendant described.

¶ 34    The jury also heard evidence J.T. made contemporaneous statements about defendant's conduct while it was ongoing. J.T. told her cousin about the abuse but asked her not to tell anyone. J.T. also reported the abuse to her grandmother the morning after what was the last incident of abuse. Finally, the jury heard defendant's own mother testify defendant told her J.T. had instigated the sexual touching, admitting the charged conduct had occurred but blaming J.T.

¶ 35    Based on the strength of the State's evidence in this case, a reasonable probability does not exist the result of this proceeding would have been different had the jury not seen the portion of J.T.'s recorded interview of which he complains.

¶ 36                                III. CONCLUSION

¶ 37        For the reasons stated, we affirm the trial court's judgment.

¶ 38        Affirmed.